In the Matter of the Application of PIONEER MILL COMPANY, LIMITED, to register and confirm its title to land situate at Lahaina, Island and County of Maui, State of Hawaii

No. 5053

May 25, 1972

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON, JJ., AND CIRCUIT JUDGE VITOUSEK IN PLACE OF KOBAYASHI, J., DISQUALIFIED

OPINION OF THE COURT BY ABE, J.

On June 28, 1919, Pioneer Mill Co. filed an application in the Land Court to register title to a parcel of Hawaii real estate. For reasons not apparent in the record, the matter was not heard until September of 1967. On November 15, 1967, the Land Court judge rendered an informal oral decision from the bench. No formal decision was written at that time, nothing was filed, and the judge expressly stated that the decision would be effective only when signed. The case then remained dormant until March of 1970 when Pioneer Mill submitted proposed findings of fact.

In the meantime, the Land Court judge, on February 3, 1970 made a public announcement concerning his intention to seek public office.[1] Formal nomination papers were filed on August 13, 1970.

On March 13, 1970, some time after the announcement relating to his candidacy, the Land Court judge attempted to conclude the Pioneer Mill litigation. The formal decision that was filed was signed by both the Land Court judge

---

[1] We take judicial notice of the fact that on February 3, 1970, the Land Court judge, in his newly opened campaign headquarters, made an announcement concerning his candidacy for public office.

Rule 806(3) of the American Law Institute's *Model Code of Evidence* provides that reviewing courts may take judicial notice of a fact whether or not the trial court did so. Rule 802(c) sanctions judicial notice of "propositions of generalized knowledge which are capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy." Parties in the present case have attached photocopies of newspaper articles noting the fact that an announcement was made, the date of the announcement, and the fact that it concerned the Land Court judge's intention to become a candidate.

We subscribe to the position of IX Wigmore, *Evidence* § 2567 at 535-536 (1940), and *United States v. Aluminum Co. of America*, 148 F.2d 416, 446 (2d Cir. 1945) that the effect of judicial notice is that a fact is taken to be true unless rebutted.

If we felt the facts in this case were unclear, we would remand for a resolution of the issues raised. We would not simply assume that the facts were as the dissent suggests.

and by the "Second Judge of the Land Court." The latter had heard none of the evidence in the case and had not participated in the trial in any way. In addition, in a curious order dated March 13, 1970 the second judge of the Land Court appointed the first Land Court judge a "master" to report findings made in the trial held three years earlier.[2]

On this appeal the parties argued and briefed the question of whether the Second Circuit Court should have dismissed the State's appeal from the Land Court because the issues had not been framed within a certain time. Noting that a more basic issue was posed by the Land Court judge's announcement relating to his candidacy for public office, we requested additional briefing. We have concluded that the Land Court judge had become a candidate for public office at the time he rendered the decision below, and that under the Hawaii Constitution, he had forfeited his judgeship. The case must be remanded for a new trial.

Haw. Const. art. V, Sec. 3 provides:

Any justice or judge who shall become a candidate for an elective office shall thereby forfeit his office.

In our view this provision seeks to accomplish two objectives: (1) to remove from the bench any judge whose impartiality might be affected by the fact that he is seeking public office; and (2) to avoid even the appearance that a judge might temper his decision so as to garner the most votes.

Neither the constitutional provision nor the convention's record defines the moment at which a person becomes a candidate. In our view, however, if the drafters of Art. V intended to accomplish anything, they intended to disqualify a judge who, as here, has availed himself of a campaign headquarters set up for him and has made a public announcement that he will seek office. We see no distinction between a person who announces that he will become a candidate in one month and a person who announces that he is a can-

---

[2]It appears odd that the judges undertook these curious acts if none of the parties and the judges had any doubts as to the legality of Judge King's signing the decree as implied in the dissenting opinion.

didate. In either case the constitutional draftsmen had reason to fear that a judge would either lack complete independence or would lack the appearance of independence.

We reject the position that a person becomes a candidate only when his formal nomination papers are filed. We think that when the constitutional draftsmen chose the word "candidate," they intended the ordinary meaning of the word to apply. We do not believe that our constitution's draftsmen would have used the broad term "candidate" if they had intended to disqualify a judge only after he has filed his nomination papers.

Under the dissent's interpretation our constitutional draftsmen apparently had no objection to one of the Supreme Court justices' remaining on the bench after announcing today that on the expiration of the term of his judgeship *he would become* a candidate for public office. He could make speeches at a campaign headquarters set up by his supporters, and they could actively solicit funds, enlist volunteer workers, and pursue the votes of the public. So long as the judge cloaks his references to his campaign with the magic words that he "will become" a candidate, he could remain on the bench. We think our constitution's draftsmen intended otherwise.

The main thrust of the dissent seems to be that the constitutional disqualification is a rather silly provision and should be interpreted as strictly as possible. The dissent points out that the provision disqualifies judges when there is little likelihood that they are not impartial, that it burdens litigants by necessitating retrials of correctly decided cases, that it requires this court and potentially disqualified judges to make a complex factual determination of when a person becomes a "candidate" and that the provision creates dangers that a judge will be unwillingly catapulted into a candidacy by acts of overzealous supporters, or will announce his candidacy, and later revoke the announcement when it is too late to regain his judgeship.

These points should be presented not to us, but to the drafters of the Constitution. Our task as judges is not to

rewrite the Constitution. Our system of government depends on each branch's recognition of the limitations to its power. The constitutional drafters wrote the Constitution which the people adopted. Our task is to apply the language in particular factual settings. When interpreting ambiguous provisions we attempt to determine the purposes which the provision was designed to achieve. We are always reluctant to decide that the constitutional draftsmen intended to accomplish what appears to be an absurd result. But when we conclude that the constitution's draftsmen intended to use the word candidate in its ordinary meaning, the inquiry stops. We do not go on to decide whether or not the provision is sensible, and we do not, if we feel a provision is unwise, simply indulge in an exacerbated interpretation of a commonly used term.

In any event, we think the need to preserve both actual and apparent integrity of the judicial system warrants the imposition of whatever difficulties are posed for individual judges.

Our holding is supported both by reason and precedent. A very early case, *Leonard v. Commonwealth,* 112 Pa. 607, 4 A. 220 (1886), dealt with a provision of the Pennsylvania Constitution which provided that "any person who shall, while a candidate for office . . . be guilty of . . . willful violation of any election law, shall be forever disqualified from holding any office . . . ." The Pennsylvania court was called upon to decide whether an official had been a "candidate" at the time he violated an election law. Although the facts and constitutional provisions involved in that case are not identical to those before us now, we find the court's analysis of the word "candidate" instructive:

> The clause of the constitution referred to must receive a liberal construction. It is to be interpreted so as to carry out the great principles of government, not to defeat them. It is not to receive a technical construction, like a common-law instrument or statute . . . . The object aimed at in the constitutional provision was the purification of our elections. . . . It recognizes the fact that many of the frauds which affect elections, and sometimes

thwart the will of the people, are perpetrated in what may be termed the preliminary stages of an election,—in those proceedings by means of which candidates are selected for the people to vote for at the general election. . . .

. . . .

The word "candidate" in the constitution is to be understood in its ordinary popular meaning, as the people understood it whose votes at the polls gave that instrument the force and effect of organic law. Webster defines the word to mean "one who seeks or aspires to some office or privilege, or who offers himself for the same." This is the popular meaning of the word "candidate." It is doubtless the meaning which the members of the constitutional convention attached to it, and the sense in which the people regarded it when they came to vote. We therefore say, in every-day life, that a man is a candidate for an office when he is seeking such office. It is begging the question to say that he is only a candidate after nomination, for many persons have been elected to office who were never nominated at all. We hold, therefore, that the defendant was a candidate for office within the meaning of the constitution . . . .

112 Pa. at 624, 4 A. at 224.

In *Adams v. Lansdon,* 18 Idaho 483, 110 P. 280 (1910), which again dealt with provisions and acts somewhat different than those before us, the Idaho court construed a provision of a corrupt practices act governing the conduct and limiting the expenditures of "candidates." The court held that "a man is a candidate for an office at the time he begins to seek such office or lay his plans to procure the nomination for such office." 18 Idaho at 506, 110 P. at 287. The court said:

The contention that a person is not a candidate until after he files his nomination papers is not in accord with the clear purpose and intent of the primary election

law . . . . The law was intended to apply to all persons who may in any way be candidates to be voted for at the primary election and all such are amenable to the provisions of the law. It is clear to us that a man is a candidate for an office at the time he begins to seek such office or lay his plans to procure the nomination for such office . . . . So, under our primary election law, a person is considered to be and is a candidate for an office when he begins to seek a nomination for that office, and, if we give the narrow construction contended for by counsel to the term "candidate," the very object and purpose of the statute would be defeated and a candidate for office might resort to all manner of bribery, promises, and expenditures of money in procuring his nomination up to the time he filed his nomination papers, and if he should after that time not commit any bribery, not make any promises, and not make any expenditures of money in aid or promotion of his nomination, he would wholly evade the penal provisions of said statute . . . . [I]f a candidate were permitted to expend any amount of money he desired to expend prior to the date of filing his nomination papers, and only had to account for the money that he expended between the filing of said papers and the primary election, there would be no motive for him to violate the law. A person seeking a nomination under our primary election law for an office becomes a candidate whenever he begins to lay his plans to aid or promote his nomination. Any other construction placed upon said act would be contrary to the letter as well as the spirit of said act, for the clear intention is to bring every person seeking a nomination at a primary election within the prohibitory provisions of said act just as soon as he does some overt act or thing in promoting his candidacy or in aid or promotion of his nomination. We therefore hold that a person who begins and continues to seek a nomination for a public office under the provisions of said act up to and including the day of the primary election must file the itemized account provided for by said sec-

tions 24 and 25, and is subject and amenable to the penal provision of said act.

18 Idaho 503-06, 110 P. at 287-88.

More recent cases, although involving different statutes and facts, have similarly held that a person becomes a candidate when he announces his intention to run for office. In *State v. Swanson*, 291 N.W. 481 (Neb. 1940), for example, the court held that "a person becomes a candidate for an office when he announces that he will seek election to the office . . . . To permit violations of the corrupt practices act on the eve of filing . . . would amount to a circumvention of the statute. The intention of the legislature is clear and it becomes the duty of the court to make it effective . . . ." 291 N.W. at 482-83. *Accord, Mayer v. Hemphill*, 411 Pa. 1, 190 A.2d 444 (1963).

We recognize that HRS § 12-1 ff. (Supp. 1971) which deals with the mechanics of filing nomination papers and the printing of ballots, uses the term "candidate" to mean only those who have filed nomination papers. That statute, however, uses the word candidate for its own purposes, that is, the regulation of the mechanics of filing nomination papers. Its use of the word is therefore of little utility in interpreting the broader purpose of the Constitution. We also recognize that some cases interpreting criminal statutes have construed the term "candidate" more strictly [*See e.g.*, *State ex rel. Brady v. Bates*, 102 Minn. 104, 112 N.W. 1026 *(1907)*]. Those cases may be distinguishable since criminal statutes receive strict construction, while statutes seeking to provide litigants with an unbiased tribunal should receive liberal construction. To the extent such cases are not distinguishable, we find them unpersuasive.

Nor do we believe that the de facto officer doctrine validates the Land Court judge's decision. While ordinarily acts of a person who has the reputation and appearance of a public officer are of the same validity as acts of a true office holder,[3] where a judge is disqualified from holding office

---

[3]In re Sherretz, 40 Haw. 366 (1953); Note, The *De Facto* Doctrine, 63 Colum.

because of "basic constitutional protections designed in part for the benefit of litigants," the de facto officer doctrine is inapplicable, and the case must be retried. *Glidden Co. v. Zdanok*, 370 U.S. 530, 535-38 (1962).[4] And because the language of the constitutional provision manifests an intention to create an absolute disqualification which is jurisdictional in nature, we must reach the issue despite the parties' failure to raise the matter either in the court below or in this court. *Glidden Co. v. Zdanok*, 370 U.S. 530, 535-38 (1962); *United States v. Amerine*, 411 F.2d 1130 (6th Cir. 1969); *United States v. Tod*, 1 F.2d 246, 249-50 (2d Cir. 1924); *Fry v. Tucker*, 146 Tex. 18, 202 S.W.2d 218 (1947).

We think it equally clear that the signature of the second judge of the Land Court cannot validate the decree entered. Obviously the second judge could not make a decision when he had taken no part in the trial of the case. Nor could he, on March 13, 1970, validly appoint the first judge of the Land Court to be a master. A land court judge could not serve in a single case as a judge and as a master, and a master cannot be appointed to render conclusions on the basis of evidence already heard. Nor could the second judge

---

L. Rev. 909 (1963); A. Soled, The Ultimate Fiction, 44 Denv. L. J. 584, 603-07 (1967); E. Beiser, The Status of a Malapportioned Legislature, 72 Dick. L. Rev. 553, 556 ff. (1968).

[4]*See also* United States v. Allocco, 305 F.2d 704 (2d Cir. 1962), *cert. den.*, 371 U.S. 964 (1963); United States v. Montanez, 371 F.2d 79 (2d Cir. 1967); United States v. Machado, 306 F. Supp. 995 (N.D. Cal. 1969); Note, The *De Facto* Officer Doctrine, 63 Colum. L. Rev. 909, 916 ff. (1963).

*Glidden* was a consolidated case in which two petitioners sought reversal of federal court decisions on the ground that the judges assigned to their cases were not judges whose tenure and amount of compensation were protected by Article III, which provides for lifetime appointment and compensation which cannot be reduced during a judge's term of office. One of the petitioners was objecting to a Court of Appeals decision, at which one of the judges was a substitute judge from the Court of Claims. The other petitioner was objecting to the fact that a retired judge from the Court of Customs and Patent Appeals had heard his case in the Federal District Court.

enter a decree on the basis of the first judge's oral decision, since the decision was not filed, was not complete, and was not intended to be effective until signed.[5] *Lopez v. Tavares*, 51 Haw. 94, 451 P.2d 804 (1969).

The case is remanded for a new trial. No costs to be awarded for this appeal.

*Donald E. Scearce* (*Robert B. Bunn* with him on the briefs, *Cades, Schutte, Fleming & Wright* of counsel) for applicant-appellant.

*Allen W. Wooddell* (*Stephen M. Okano* and *Franklin K. Mukai* on the briefs, *Wooddell, Mukai, Wirtz & Ichiki* of counsel) for contestants-appellants.

*Andrew S. O. Lee*, Deputy Attorney General (*George Pai*, Attorney General and *Gerald Y. Y. Chang*, Deputy Attorney General, with him on the briefs), for appellee.

DISSENTING OPINION OF MARUMOTO, J.,
WITH WHOM CIRCUIT JUDGE VITOUSEK JOINS

I dissent from the portion of the opinion of the court which holds that Judge Samuel P. King forfeited his office as a judge of the land court on February 3, 1970, when he made a statement touching upon his candidacy for governor, as reported in the Honolulu Star-Bulletin of that day and the Honolulu Advertiser of the following day.

---

In the Supreme Court it was argued that even if the judges had not been properly designated to serve in the federal courts, they were "de facto" officers whose authority could not be contested by the petitioners. The Supreme Court held that Article III, giving federal judges lifetime tenure and guaranteed compensation, was designed to provide litigants with an impartial tribunal and was a basic constitutional protection designed to protect their interests. The petitioners could thus challenge the defect in the judge's authority without regard to the de facto officer doctrine and despite their failure to raise the issue in the courts below.

[5]The normal rule, of course, is that only the judge who conducted the trial may enter a decision in a case. *Atlas Financial Corp. v. Oliver*, . . . . . . Vt. . . . . . ., 274 A.2d 687 (1971); *Cram v. Bach*, 1 Wis. 2d 378, 83 N.W.2d 877 (1957). Rule 63 of the Haw. Rules of Civ. Pro., although inapplicable to Land Court Proceedings [Rule 81(a)], enables one judge to perform duties in a case after a disabled judge has returned a verdict or filed findings of fact and conclusions of law. The rule

The information which this court has regarding Judge King's statement is contained in identical materials attached as exhibits to the reply briefs of the attorney general and the contestants-appellants. The materials are (1) a photostatic copy of a portion of a page of the Star-Bulletin; and (2) a photostatic copy of a portion of a page of the Advertiser.

The photostatic copy from the Star-Bulletin only shows a headline of an article reading: "King Announces His Candidacy for Governor." It does not contain the body of the article.

The photostatic copy from the Advertiser contains an article written by Gerry Keir, politics writer of that newspaper. The article reported:

"As expected, the Republican situation solidified when Samuel P. King, Family Court judge, announced that he will step down from the bench March 16 to become Samuel P. King, Republican candidate for governor.

"King made his candidacy announcement at a gathering of family, supporters and the press in his newly-opened campaign headquarters in downtown Honolulu.

"* * * *

"King said he has submitted his resignation to Gov. John A. Burns and Chief Justice William S. Richardson to take effect March 16. The lead time, he said is to allow adequate notice to the State Retirement System and to give Burns time to name a replacement.

"Until he leaves the bench, King said, he will make

---

seeks to allow the successor judge to complete the formal acts necessary to conclude the litigations, such as entering formal judgment, issuing injunctions, awarding costs, and hearing post trial motions. However, the rule can only be invoked where a complete and final decision has been rendered by the disabled judge. The danger that one judge might misinterpret a prior judge's informal notes or oral statements, or err in attempting to judge the credibility of witnesses from a transcript is thought to be sufficiently great that the judicial system should be put to the inconvenience of conducting a new trial. Bromberg v. Moul, 275 F.2d 574 (2d Cir. 1960). Hence, even if Rule 63 were applicable to land court proceedings, we could not avoid the necessity of awarding a new trial in this case.

no statements about a campaign program and will 'continue to preside at Family Court with 100 per cent of my heart and mind as I have done for so many years.' "

In connection with the newspaper report quoted above, it may be stated that Judge King was both a judge of the land court and a judge of the family court. Also, the statement in the second paragraph that the announcement was made in "his newly-opened headquarters" does not necessarily mean that Judge King established the headquarters. The headquarters might have been established by his supporters.

The forfeiture was declared under a provision in Article V, Section 3, of the Hawaii Constitution, which reads: "Any justice or judge who shall become a candidate for an elective office shall thereby forfeit his office."

The question for decision in this phase of the case is: When does a judge become a candidate for an elective office, within the purview of that constitutional provision?

This court raised the question sua sponte. The question was not raised by any of the parties.

In the brief filed in response to the request of this court for additional briefing, the attorney general took the position that a judge should be deemed to have become a candidate for an elective office upon the filing of a nomination paper under HRS § 13-13. He stated:

"The Hawaii Constitution, Article V, Section 3, explicitly provides that 'Any justice or judge who shall become a candidate for an elective office shall thereby forfeit his office.' This constitutional provision is clear and unambiguous, and must be read in conjunction with Section 12-3, Hawaii Revised Statutes, which provides that a candidate's name will not be printed on the primary or special election ballot unless he has filed nomination papers and Section 12-2, H.R.S., which provides that no person shall be a candidate at the general election unless nominated in the primary. Thus, in order to come within the forfeiture provision of Article V, Section 3 of the Hawaii Constitution, a justice or judge must be

a candidate for office and he is not officially a candidate until his nomination papers are filed."

The attorney general changed his position in the reply brief which he subsequently filed. The position stated in the reply brief is that a judge becomes a candidate for an elective office when he opens his campaign headquarters and announces his candidacy for such office.

The attorney general's revised position may be correct in construing the word "candidate" in the context of corrupt practices acts. Here, the phrase, "shall become a candidate for an elective office", must be considered in the context of the constitutional provision in question. When the phrase is so considered, I think that the attorney general's original position is correct.

The provision in question was adopted at the constitutional convention of 1950. The proceedings of that convention contain no discussion of the provision. So, there is no means of ascertaining the thinking of the members of the convention.

The task of this court here is to resolve the question upon a consideration and balancing of relevant factors. *Hayes v. Gill*, 52 Haw. 251, 254, 473 P.2d 872, 875 (1970). I think that, in the context of the provision in question, a judge should be deemed to have become a candidate for an elective office upon the filing of a nomination paper under HRS § 13-13, for the following reasons:

(1) The provision involves a possibility of forfeiture of office. There appears to be no question that a forfeiture of judgeship thereunder is absolute. Once a judge becomes a candidate for an elective office, he has reached a point of no return. A renunciation of office will not restore the office to him. There is no *locus penitentiae* for the judge.[1]

---

[1]A different consideration applies to the construction of the word "candidate" under corrupt practices acts. In Adams v. Lansdon, 18 Idaho 483, 110 P. 280 (1910), it is stated that, under the Idaho corrupt practices act, a person "seeking

(2) A forfeiture of judgeship affects not only the judge whose office is forfeited, but also the parties involved in the proceedings adjudicated by the judge. If such forfeiture occurs, a consequence which will naturally follow is that all decisions of the judge filed after the effective date of the forfeiture will be nullified.[2]

(3) Because of the considerations mentioned above, the provision should be construed strictly, the test to determine when a judge becomes a candidate for an elective office should be simple, and the result should not depend on a statement or conduct which may be construed differently by different persons.

The requirements mentioned above are met by treating the filing of a nomination paper as the determinative act.

The matter is so handled in Alaska by a specific language in its constitution. A provision in Article IV, Section 14, reads: "Any supreme court justice or superior court judge filing for another elective public office forfeits his judicial position."

It may be argued that if the framers of our constitution intended that a judge should be deemed to have become a candidate for an elective office upon the filing of a nomination paper, they would have specifically so provided. The answer to such argument is that if they intended some other act, such as public announcement of candidacy, to be the determinative act, they would have provided so specifically, as the framers of the Philadelphia Home Rule Charter of

---

a nomination under our state primary election law for an office becomes a candidate whenever he begins to lay his plans to aid or promote his nomination." But the opinion also states, with regard to a person who withdraws at the last minute: "In such a case, if the person did not enter the race for the office to the extent of having his name placed on the primary ballot or voted for at the election, he would not be required to render an account of the money so expended, and, of course, would not have to file an itemized statement of his expenditures."

[2]It is my information that Judge King signed no land court decisions after February 3, 1970, other than the decision in this case. However, I am informed that, as a family court judge, he signed two divorce decrees and more than 20 adoption decrees, which were filed after February 3, 1970. I view such decrees to be nullified by the holding of the court in this case.

1951 did. Section 3-400 of the Philadelphia charter prohibits the mayor from becoming a candidate for any other elective office during his term. It further provides: "Should he announce his candidacy for any other office he shall be automatically disqualified to continue to serve as Mayor, and the office shall be deemed vacant."

The test set forth in the opinion of the court is that a judge is deemed to have become a candidate for an elective office when he has "made a public announcement concerning his intention to seek public office." The holding is that Judge King became a candidate for governor under that test on February 3, 1970.

The statement of the test and its application to Judge King pose troublesome questions, which I will state and discuss below.

One question is: If a judge announces his decision to seek an elective office and at the same time announces that he will become a candidate for the office as of a particular future date, does he become a candidate for the office the moment he makes the announcement, although he does nothing else with respect to his candidacy until the announced date of candidacy?

The information before this court is that on February 3, 1970, Judge King made a statement that he would step down from the bench on March 16, 1970, to become Samuel P. King, Republican candidate for governor; that he had submitted his resignation as judge to take effect on March 16; and that, until then, he would preside at the family court with 100 percent of his heart and mind, as he had done for so many years.

This court has no evidence that Judge King did anything with respect to his candidacy for governor between February 3, 1970, and March 16, 1970, other than to make the statement on the former date. Thus, it must be assumed that, during that period, he devoted his full time in discharging his judicial duties.

It appears that Judge King's statement was not a state-

ment of present candidacy; rather, it was a statement of future candidacy. I think that it is reasonable to construe the statement to mean that Judge King would become a candidate for governor on March 16, 1970, not that he became a candidate on February 3, 1970.

Apparently, such was the construction placed on Judge King's statement by the attorney general and the other attorneys in this case, and the attorneys involved in the divorce and adoption proceedings adjudicated by the judge after February 3, 1970. None of them questioned Judge King's authority to act in the proceedings between February 3, 1970, and March 16, 1970.

The other question is: If conducting an active campaign is a necessary element in the test to determine whether a judge may be deemed to have become a candidate for an elective office, is there any evidence before this court which establishes that Judge King was conducting an active campaign for governor between February 3, 1970, and March 16, 1970?

There is no material in the record, hearsay or otherwise, which shows that Judge King personally engaged in any political activity, after he made the reported statement on February 3, 1970, and before he left the bench on March 16, 1970.

I do not think that it can be said that Judge King conducted an active campaign unless he did so personally.

The newspaper article reported that Judge King made his statement at "his newly-opened campaign headquarters." I do not think that such report alone furnishes a sufficient basis for a finding that Judge King was conducting an active campaign for governor before March 16, 1970.

Because the constitutional provision in question involves serious consequences previously discussed, any test to determine the time that a judge becomes a candidate for an elective office should be strictly applied. If the test stated in the opinion of the court is strictly applied, a reasonable result

to be arrived at from such application will be that Judge King became a candidate for governor and forfeited his office on March 16, 1970, three days after he signed the decision in this case.

Thus, in this case, it will make no difference whether the court's test is followed or the test which I have advanced in this dissent is followed.

The discussion above underscores the point I made earlier, that the test to determine the time that a judge becomes a candidate for an elective office should be simple and that the determination should not depend on a statement or conduct which may be construed differently by different persons.

The filing of a nomination paper is a simple and unequivocal act. There can be no difference of opinion as to whether a nomination paper was filed or was not filed. Nor can any argument arise as to when it was filed. Those matters can be easily resolved from the records kept at the offices where the nomination papers are required to be filed.