625 P.2d 398

In the Interest of Angela Dee HOLT,
A child under 18 years of age.

STATE of Idaho, DEPARTMENT OF
HEALTH AND WELFARE,
Petitioner-Respondent,

v.

Victoria E. HOLT, Respondent-Appellant.

No. 13287.

Supreme Court of Idaho.

March 18, 1981.

Randy J. Stoker of Kvanvig, Stoker & Stanger, Twin Falls, for respondent-appellant.

David H. Leroy, Atty. Gen., James T. Baird, Deputy Atty. Gen., Twin Falls, for petitioner-respondent.

McFADDEN, Justice.

This is an appeal from an order of the district court affirming an order of the magistrate division of that court which terminated the parental rights of appellant to her minor child, Angela Dee Holt. The magistrate's order was appealed to the district court pursuant to I.C. § 16–2014 and I.R.C.P. 83. We affirm.

Counsel representing the appellant on this appeal did not represent her in the proceedings in the lower court. This opinion is being subdivided into related portions to make more understandable the issues being presented on this appeal.

I

The record of the hearing in the magistrate's court discloses the following: Victoria Holt is the natural mother of Angela Dee Holt, born April 5, 1976. Victoria is appealing a decision of the district court which upheld a magistrate court decision to

terminate her parental rights under I.C. § 16–2001 et seq.[1]

At the time of Angela's birth, Victoria was an unwed minor, living in a foster home, and on probation to the Department of Health and Welfare pursuant to the Youth Rehabilitation Act as a result of issuing an insufficient fund check in 1975. The probation and foster care continued during Victoria's minority until January 1977. During this time Health and Welfare set guidelines to assist Victoria in caring for her child.

In May 1976, Victoria was incarcerated as a result of a probation violation. This incarceration lasted approximately two weeks. Following the probation violation, the Department petitioned the magistrate division of the Fifth District Court under the Child Protective Act to take the child into protective custody and place her in foster care. An order of temporary shelter was issued. On July 27, Victoria agreed before the magistrate court to Health and Welfare custody of Angela. She was not represented by counsel at this time. On August 24, the court issued an order affirming the stipulation and creating Departmental custody of the child for an undetermined time not to exceed two years. The child was placed in a foster home. A second order reflecting the same disposition was entered on November 17.

In September, 1976, after Victoria had progressed through two group shelter homes following her release from incarceration, and after she signed a contract with Health and Welfare governing the conditions upon which Angela would be returned to her, planning for the child's return began. In the interim, Victoria visited the child at the Health and Welfare offices. Planning meetings were held during the early part of 1977, another contract governing restored custody was signed, and a projected date set for Angela's return to Victoria.

On May 19, 1977, Victoria was arrested for forgery and issuing insufficient funds checks. On June 1, 1977, Angela was returned to Victoria pursuant to the contract agreements and other prior efforts between the Department and Victoria. The Department retained custody under the previous order entered in the magistrate court subject to the provisions of the contract allowing the child to be with Victoria. Angela remained with her mother until October 26, 1977, at which time Victoria was sentenced on the forgery and check charges. A number of caseworker visits occurred in 1977 in the period between June 1, and October 26; events during this time form the primary basis for the Department instituting the termination proceeding. At the time of sentencing, Angela was again taken by the Department pursuant to the pending protective custody and was placed in foster care.

## II

The procedures in the magistrates court.

On May 1, 1978, the Department petitioned the magistrate court for termination of Victoria's parental rights on the grounds of neglect, abandonment, inability to discharge parental duties because of mental illness, and on the basis that termination would be in the best interests of the child. At this time, Victoria was incarcerated under her previous sentence at the North Idaho Correctional Institute in Cottonwood. A public defender was appointed pursuant to I.C. § 16–2009 to represent Victoria in this proceeding.

On June 5, 1978, with Victoria and her counsel present, hearing was held before Magistrate Judge Smith. Following the conclusion of the first day of testimony, Judge Smith became ill. Upon the stipulation of the counsel for the respective parties that Judge Shaud would hear the remainder of the testimony and that a transcript thereof would then be submitted to Judge Smith for his determination of the entire

---

1. Both parties note that although the record on appeal does not reflect the fact, the parental rights of the natural father were terminated by consent. The validity of any termination as it concerns the natural father is not in issue.

matter, on June 7 the hearing continued before Magistrate Judge Shaud. The state's case in chief was presented entirely on the first day of trial before Magistrate Judge Smith and the appellant's case was presented on the second day of trial before Magistrate Judge Shaud.

On June 20, 1978, Judge Smith entered an order which set forth his findings of fact, and conclusions of law, and ordered termination of the parental rights of appellant in her child. The order also provided that legal custody of the child was to be vested in the director of the Department of Health and Welfare.

### III

### Proceedings in the District Court.

Appellant's appointed counsel filed notice of appeal to the district court requesting a trial *de novo* on the grounds that the hearing in the Magistrates Division was handled by different judges. See I.R.C.P. 83(b). In her notice of appeal she also states that she did not request a continuance because of the fact that she was serving a sentence for forgery and was to be returned to Cottonwood following the hearing. She also asserted that she was desirous of placing new testimony before the court which was not available in the magistrate proceeding.

New counsel for appellant appeared at the district court hearing on the appeal. Nothing appears in the record reflecting a ruling by the district court on the request for a trial *de novo* nor does the record contain anything reflecting what new testimony appellant wished to present to the court which was not available at the magistrate proceeding. All the record discloses is that at the time set for the hearing the district court announced that it would be heard on the record made in the magistrate court and that he had read the transcript and that the case was ready for argument.[2] This, of course, was an implicit denial of appellant's request for a trial *de novo*. After the argument the district court announced its ruling, stating that the decision

of the magistrate court was affirmed on the appeal. Later a formal order of affirmance was entered and appeal was taken to this court.

### IV

### Appeal to the Supreme Court.

Appellant's first claim of error is directed to the failure of the district court to grant a trial *de novo* on the appeal from the magistrate court. Appellant contends that this was an abuse of discretion.

Following the illness of Judge Smith, the proceedings continued the next day before Judge Shaud. The record discloses the following:

"THE COURT [Judge Shaud]: This is the time set to continue with the matter entitled *In the Interest of Angela Dee Holt*, which is a petition for termination of parent-child relationship. I understand that this was started and heard in part before Judge Smith. That due to illness on his part and certain requirements that some of the witnesses be heard at this time or at least be present at this time, it is in the best interests of all perhaps if we continue with it. It is understood, I believe, and will counsel so stipulate that I, a Magistrate from the Fifth Judicial District may continue to hear the case at this time and rule on the evidence and then from the transcript made today together with the transcript of the first half of the proceedings, Judge Smith will then make a ruling. Will counsel so stipulate?

[Counsel for State]: On behalf of the State of Idaho and the petitioner, I will so stipulate.

[Counsel for appellant]: I'm actually the one that suggested that procedure so I would so stipulate also."

I.C. § 1–2213 provides:

"(1) Appeals from final judgments of the magistrate's division shall be taken and heard in the manner prescribed by law or rule.

---

**2.** The record states that counsel waived verbatim reporting of the oral argument.

(2) Unless otherwise provided by law or rule, a district court judge shall review the case on the record on appeal and affirm, reverse, remand or modify the judgment; provided, that the district judge *in his discretion*, may remand the case for a new trial with such instructions as he may deem necessary or he *may direct that the case be tried de novo before him.*" (Emphasis added.)

I.R.C.P. 83(b) provides in pertinent part:
"Magistrate appeals—Judicial review. —All appeals from the magistrate's division shall be heard by the district court as an appellate proceeding unless the district court orders a trial de novo . . . ."

Appellant asserts that due process of law requires that in the vast majority of cases the judge who hears the evidence must also enter the final decision of the court. Appellant points to the provisions of I.R.C.P. 63 [3] in arguing this contention, but does recognize that that provision is not truly applicable to the case at hand. Here Judge Smith heard the testimony of the State's case in chief, and by stipulation of the parties Judge Shaud heard the appellant's case. This situation is no different from many cases where a trial court will hear a large part of the case by oral testimony and the balance of the testimony from depositions of the witnesses.

In our view the primary issue on this first assignment of error does not involve an issue of lack of due process of law, but more properly the issue revolves around the right of trial counsel to stipulate procedures employed at trial. In this light it is our conclusion that the trial court did not err in its review of this case as an appeal on the record instead of a trial *de novo.*

■ The reason behind the foregoing conclusion is that generally an attorney of record has implied authority to enter into stipulations and agreements respecting matters of procedure. *Silver Bowl, Inc. v. Equity Metals, Inc.,* 93 Idaho 487, 489, 464 P.2d 926 (1970); *Muncey v. Children's Home Finding & Aid Soc.,* 84 Idaho 147, 151–2, 369 P.2d 586 (1962); *Storey v. United States Fid. & Guar. Co.,* 32 Idaho 388, 183 P. 990 (1919). In open court counsel stipulated that Judge Shaud could hear the testimony following Judge Smith's illness, and that Judge Smith could ultimately decide the case, which he did. All of this dealt with a procedural step in the disposition of the case at the magistrate level. When this situation was presented to the district court as a part of the appellate record, there was nothing presented in the record to impair the authority of the district court to decide whether to hear the case on the record, or to order a trial *de novo.* The ultimate decision of the district court was one involving the exercise of its judicial discretion. In *Leonardson v. Moon,* 92 Idaho 796, 451 P.2d 542 (1969), this court stated in regard to the standard of review by this court of a discretionary ruling by the trial court, "[u]nless such discretion clearly appears to have been unwisely exercised or to have been manifestly abused it will not be disturbed on appeal." 92 Idaho at 809, 451 P.2d 542. See also *Willis v. Willis,* 93 Idaho 261, 265, 460 P.2d 396 (1969). From the record before this court we see no basis for saying that the trial court manifestly abused its discretion in not granting the appellant a trial *de novo* on her appeal to the district court.

■ The next issue presented by appellant raises a question as to the competency of her appointed trial counsel. She contends that the standards as to competency of her counsel should be those enunciated in *State v. Tucker,* 97 Idaho 4, 539 P.2d 556 (1975). However, in her notice of appeal from the magistrate court no mention was

---

**3.** "Rule 63. Disability of a judge.—If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a verdict is returned or findings of fact and conclusions of law are filed, then any other judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial."

made as to this issue, which is understandable, for it was her trial counsel that initially took this appeal on her behalf. Shortly thereafter, however, new counsel appeared on her behalf but no request was made to augment the record, nor was any issue raised in this regard as far as the district court record now before us is concerned. This court has repeatedly held that issues not properly raised below will not be considered for the first time on appeal to this court. *Heckman Ranches, Inc. v. State*, 99 Idaho 793, 799–800, 589 P.2d 540 (1979) and cases cited therein. The opportunity to raise this issue properly having been present, we see no reason to depart from that well established rule in this case.

Appellant also raises four related issues on appeal concerning the sufficiency of the evidence to support the termination order. In specific terms, appellant questions whether there was substantial and competent evidence to support termination on the basis of mental illness or deficiency, I.C. § 16–2005(d); abandonment, I.C. § 16–2005(a); neglect, I.C. § 16–2005(b) or as being in the best interests of the child, I.C. § 16–2005(e).[4]

■ The district court premised its affirmance of the termination order upon the single ground of neglect, stating that it found insufficient evidence in the record to support the other grounds set forth in the magistrate court's order (i. e., mental illness or abandonment).[5] Given this determination, we must determine whether there is substantial and competent evidence to support the finding of neglect as defined in I.C. § 16–2005(b). *State ex rel. Child v. Clouse*, 93 Idaho 893, 897, 477 P.2d 834 (1970). A thorough and conscientious review of the magistrate court transcript and decision leads us to the conclusion that, though conflicting in some respects, there was such

supportive evidence. The district court did not err in affirming the termination order on this ground.

The order of the district court affirming the termination order of the magistrates court is affirmed.

BAKES, C. J., and DONALDSON and SHEPARD, JJ., concur.

BISTLINE, Justice, dissenting.

It is important to keep in mind that this appeal presents four distinct and important propositions. First is the question whether the district court more properly would have opted for a trial de novo, instead of an appellate review. Secondly, the Court's opinion casts further confusion on the standard of review by this Court when the district court has acted as an appellate court, which confusion should be clarified. Thirdly, absolutely necessary here is at least some discussion of the evidence which the state relied on as grounds for taking this child away from its natural mother. Fourth, and finally, the issue of competence of counsel in waiving appellant's due process rights should be passed upon.

I.

The other members of this Court see no error on the part of the district court in conducting an appellate review instead of a trial de novo. I am far from convinced. The Court's apparent holding is that, because Victoria Holt's court-appointed counsel stipulated to the procedure followed in the magistrate's court, it cannot thereafter be argued that the district judge may be faulted. The Court says this notwithstanding the district court's superior position and wisdom born of many years of experience. Clearly, if the stipulation had not been entered, he should have considered the plight

---

4. Neither the magistrate court nor the district court predicated their decisions on the ground of "best interests," I.C. § 16–2005(e). (While the phrase did appear in some of the findings of fact entered by the magistrate court, it was not relied upon as a basis for decision.) Thus, we need not consider this contention.

5. The district court was correct in noting that only one of the statutory grounds for termination need be supported in the evidence for the magistrate court's order to stand. See I.C. § 16–2005 ("The court may grant an order terminating the relationship where it finds *one or more* of the following conditions exist . . . .")

of Victoria Holt and heard all of the evidence at one time rather than in the piecemeal manner that took place in the magistrate court. The Court's analysis ignores the basic due process rights of a parent in a proceeding designed to forever destroy a bond as fundamental as that between a mother and her child.

In I.C. § 16–2001, which sets forth the purposes of the provisions for termination of the parent/child relationship, the legislature stated "[i]mplicit in this act is the philosophy that wherever possible family life should be strengthened and preserved and that the issue of severing the parent and child relationship is of such vital importance as to require a judicial determination . . . ." This Court also noted the importance of the parent/child relationship in *State v. Clouse*, 93 Idaho 893, 477 P.2d 834 (1970):

> "Cases involving the welfare of children in which we are asked to reverse or modify the lower court's decision regarding the custody of the children always present a very difficult problem. Moreover, in the case at bar that problem is magnified greatly since we are not concerned with a temporary denial of custody of children to their mother, but with the complete severance of the parent-child relationship. The gravity of the latter consequence may not be denied nor the fact that severance of the parent-child relationship should be avoided unless it is the only alternative found consistent with the best interest of the children and the parents." *Id.* at 895, 477 P.2d at 836.

In the present case, Judge Smith heard the state's case, but *never* heard Victoria Holt, the mother, testify. Thus his decision was based on the live testimony against Victoria Holt presented by the state, and on but a cold record of that which Victoria Holt offered in an effort to save her child. I simply am unable to conceive of any situation where a mother's relationship with her daughter should be destroyed forever by the decision of a judge who has not, but

who could have without any unreasonable inconvenience, heard Victoria Holt's side coming from her own lips. For years and years the Idaho courts, along with all others, have stressed credibility and worthiness of a witness's testimony as being of paramount importance in evaluating the integrity of the factfinding process. How often this Court has refused to interfere with findings made below simply because the trial court both saw and heard the witnesses, observing their demeanor, apparent evasiveness, nuances, and the many things which are said to tell the trier of fact that the witness is or is not sincere, honest and worthy of belief.

*Anderson v. Dewey*, 82 Idaho 173, 180, 350 P.2d 734, 737 (1960), has taught the bench and bar for over 20 years that "[i]n cases tried without a jury, the general rule is that a party litigant is entitled to a decision on the facts by a judge who heard and saw the witnesses, and that a deprivation of that right is a denial of due process." Similarly, the court in *Sunshine v. Sunshine*, 30 Colo.App. 67, 488 P.2d 1131 (1971), held that the lower court erred in appointing a new master, with directions to make findings and recommendations based upon the transcript of the hearings held before the first master, when the first master was taken ill. The Court drew an analogy to the situation where the trial judge dies or is removed from office during a trial. In that situation, "[t]he general rule is that his successor may only complete those acts which do no require him to compare and weigh testimony." *Id.* at 67, 488 P.2d at 1133. The court then held as follows:

> "Inasmuch as the Master occupies the position of finder of fact, we hold that in case of death of the Master before findings are made, it is necessary that his successor begin the proceedings anew, or that the trial court hold hearings on its own before making findings. A successor master who fails to conduct a hearing *de novo* lacks jurisdiction to enter any findings or conclusions. Mutual consent cannot confer jurisdiction where it is absent." *Id.* at 67, 488 P.2d at 1134.

The court in *Application of Pioneer Mill Co.*, 53 Haw. 496, 497 P.2d 549 (1972), explained this rule as follows:

> "The normal rule, of course, is that only the judge who conducted the trial may enter a decision in a case.... Rule 63 ... enables one judge to perform duties in a case after a disabled judge has returned a verdict or filed findings of fact and conclusions of law. The rule seeks to allow the successor judge to complete the formal acts necessary to conclude the litigations, such as entering formal judgment, issuing injunctions, awarding costs, and hearing post trial motions. However, the rule can only be invoked where a complete and final decision has been rendered by the disabled judge. The danger that one judge might misinterpret a prior judge's informal notes or oral statements, *or err in attempting to judge the credibility of witnesses from a transcript* is thought to be sufficiently great that the judicial system should be put to the inconvenience of conducting a new trial." *Id.* at 505 n.5, 497 P.2d at 555 n.5 (emphasis added).

While our I.R.C.P. 63 (identical to Hawaii's) allows for a successor judge to perform the initial judge's duties where a verdict has been returned or findings of fact and conclusions of law filed, there has never been and still is not a provision for two judges separately hearing parts of the testimony, but with only one rendering a decision. *See Anderson v. Dewey*, 82 Idaho 173, 180, 350 P.2d 734, 737 (1960) ("in a case where the successor judge, in resolving the issues raised by a motion for a new trial, is not required to weigh conflicting evidence or pass upon the credibility of witnesses, but can resolve such issues upon questions of law, or upon evidence which is not materially in conflict, he may exercise the same authority as could the judge who tried the case"); *see also Louis v. Blackburn*, 630 F.2d 1105, 1109 (5th Cir. 1980) ("we have severe doubt about the constitutionality of the district judge's reassessment of credibility without seeing and hearing the witnesses himself. Accordingly, in a situation involving the constitutional rights of a crimi-nal defendant, we hold that the district judge should not enter an order inconsistent with the credibility choices made by the magistrate without personally hearing the live testimony of the witnesses whose testimony is determinative.")

The fundamental nature of the mother-child relationship is not so readily denied. Nor can it be denied that it is a fundamental right to require that the awesome, God-like decision to terminate that relationship be made by a trial judge who hears all the testimony. Query: Should counsel's stipulation to a deviation constitutional in nature bind his legally ignorant client?

It is at once obvious that the highly unusual arrangement, unique in the annals of Idaho jurisprudence, was fallen into only because Victoria Holt was incarcerated at the time and was due to be returned to Cottonwood as soon as the hearing was over. The statements of her attorney at the beginning of the hearing lend the necessary illumination to the situation as he visualized it:

> "I realize that this is noticed up kind of on an emergency basis and I know what the story holds and what the circumstances are. I have no objection to going ahead with this proceeding today as a preliminary matter, but I'm hoping the court has no intention of making any final decisions today in any event.
>
> . . . .
>
> ... Well, my only feeling is, if this had been—With as little notice as I had—If Victoria had been you know, a free person, then I would have asked for enough time to get together with her and have a continuance but because she's incarcerated and the circumstances being as they were, there wasn't a lot I could do except to go ahead with this hearing but —. . . ."

In the notice of appeal to the district court counsel attempted the further explanation that Victoria Holt "did not request a continuance by and for the reason that she was incarcerated at the time and was due to be returned to Cottonwood as soon as the hearing was over."

The Court's opinion cites various cases for the proposition that an attorney can stipulate regarding matters of procedure to support its holding that, given the instant stipulation, it was not an abuse of discretion to refuse to conduct a trial de novo. However, none of those cases, on even a cursory examination, shows an involvement of a right as basic as the one here. In fact, in one of those cases, *Muncey v. Children's Home Finding & Aid Society*, 84 Idaho 147, 152, 369 P.2d 586, 588–89 (1962), Justice McFadden wrote for a unanimous Court: "it is well settled that '* * * *The implied authority of an attorney ordinarily does not extend to the doing of acts which will result in the surrender or giving up any substantial right of the client. * * **' 7 C.J.S. Attorney and Client § 79, p. 897." (Emphasis added.) The conduct in the present case went far beyond stipulating to a mere matter of procedure; it infringed on the very integrity of the factfinding process.

Whether the failure of Victoria's counsel to obtain a continuance was attributable to duress in light of her incarceration, was a regard for what might have been viewed as the apparently overwhelming circumstances, was a desire to simplify the procedures, was an effort to save the state the expenses and inconvenience of a continuance, or was a mere mistake, that failure should not operate to foreclose her absolute right to a fair trial. A district court, sitting in review of a magistrate court decision, should be extremely observing and cautious when the error in the stipulated course of proceedings was forcefully and forthrightly presented— especially when done so by the very attorney involved.

This Court has committed itself to the proposition that it will review fundamental errors even if not objected to at trial.

*State v. Haggard*, 94 Idaho 249, 486 P.2d 260 (1971). Fundamental errors are most apt to appear in connection with fundamental rights, and with fundamental relationships. Is there any relationship more fundamental to the fabric of our society and to the individuals involved than the parent-child bond or any error more fundamental than that which occurred here? That relationship should never be ripped asunder without there first having been provided every full judicial protection. The cost to the State of Idaho of providing a full de novo hearing in the present case would be the nearest thing to nothing. The cost of not having one is the production of a tragedy. There was every sound reason for the district court to have conducted a trial de novo. There was no sound reason for doing otherwise.[1]

## II.

Secondly, since the Court has held that the district court did not abuse its discretion in choosing to act as an appellate court, some mention must also be made of this Court's standard of review of a district court decision when that court sits as an appellate court.[2] Our review in such cases is primarily of the magistrate's decision, not of the appellate decision of the district court. If we perceive no error on the part of the trial court's decision, a fortiori, the intermediate appellate decision to the contrary is in error. We would simply reinstate. Here, the Court seems to be stating that all that is needed is a review of the finding of neglect because so long as one ground of the magistrate's decision is correct, no other need be reviewed. If so, I would agree. But if the opinion is read as saying that we are bound to review only what the district court found, then I would

---

1. That the district court found error in four of five assignments was itself a red flag of warning—indicative of the results which might have been expected in such a bizarre procedure.

2. Mention should also be made of this feature which, of the western states, appears to be unique to Idaho. Here a district court may deal with a magistrate's decision in almost any manner. The district court, without any requirement or provision for hearing from counsel, may allow a trial de novo, an appellate review, or appellate review and partial new trial. This has consistently led to nothing but mischief; its existence should be reconsidered. Perhaps, with the advent of the Intermediate Court of Appeals, it will go away. I refer the interested reader to *State v. Dillard*, 101 Idaho 917, 623 P.2d 1294 (1981).

disagree. We could just as easily look at any of the other findings of the magistrate, and if there is substantial competent evidence to support any of the other findings, the district court appellate decision would be in error, and we could affirm the magistrate's decision on that other ground.

### III.

Next, something more should be said about the evidence of neglect than that said by the Court. While Health & Welfare efforts to help Victoria following the birth of her daughter were laudable, the extent to which the state thereafter has gone to take Victoria's daughter from her ill behooves an entity supposedly concerned with strengthening and preserving family life. The state apparently has acted under the belief that if enough *complaints* are presented to the court against Victoria, the totality will satisfactorily establish her unfitness to be a mother, regardless of the merit to the complaints. In so doing, however, the state, and now the Court, has apparently lost touch with the realities of motherhood. A few examples of what the state says constitute "neglect" will suffice to demonstrate.

The state argues that Victoria at times appeared unconcerned with the child's toilet training. This was based on a social worker's observation, during three one-hour visits per week, that Victoria was inconsistent in her training and that it was unusual for a fourteen month old baby not to be toilet trained. If this be so, it is a grievous fault, and many are the parents I know who have proven to be unfit. The state also points out that on several occasions Victoria's home was not clean or picked up. But anyone knows that a single parent with a child will have difficulty in keeping a home clean. The state uses other examples such as appellant pinching the child on the nipple (although the evidence shows this was done in an affectionate manner and did not cause the child to cry), that appellant called the

child a whiney boob and that the child appeared fearful of strangers, though now she shows no such fear (most children go through periods when they are fearful of strangers, and most mothers at one time or another use a phrase for their child that they may later regret), that Victoria's belongings were removed by her landlord because she had failed to pay her rent (I was unaware that financial problems were grounds for losing one's child), and that Victoria called herself a social deviate (nor was I aware that social deviates must lose their children—in fact much has been written insisting that homosexuals are not thereby incapacitated from rearing children). I.C. § 16–2005(b) defines neglect as "a situation in which the child lacks parental care necessary for his health, morals and well-being." Without even discussing possible problems of vagueness here, I cannot believe our society has progressed to the point that the above examples will serve to justify the taking away of a child on the grounds of neglect.[3]

What we are really talking about here is a seventeen year old who has become a mother, but who herself unfortunately did not belong to any family of stability or substance. Because of that very fact, and in recognition of it, Health & Welfare at first intervened on her behalf—and properly and commendably so—under the doctrine of parens patriae. It would be a miracle indeed had she not encountered problems and made mistakes both in raising her child and in arranging her own life. Arriving at maturity is hard enough; doing it as a destitute seventeen year old mother may well be one of the hardest tasks envisionable.

Given the efforts made by Health & Welfare to help Victoria prior to her last criminal conviction, it can only be concluded that the state decided that her incarceration was the end of the line—she must also forfeit her child. If so, and such is the only logical reason for the state's turnabout,

---

3. It would serve no purpose to discuss the other examples and give my own view of whether the finding of neglect is supported.

Suffice it to note that I have picked the most outrageous examples.

many will see this case as standing for the infliction of cruel and unusual punishment, albeit a consequence and not a direct penalty.

There is little evidence in the record of efforts made by the state to help Victoria herself straighten out her emotional problems and find employment. Apparently Health & Welfare's only positive actions were to give her the very psychological tests which would later be used as evidence against her in the child forfeiture proceeding. It is not unlikely that had the funds which the state is spending now in judicial resources on this case and in maintaining Victoria in prison been used in subsidizing and counseling Victoria, she might have found the maturity which she obviously did lack, and thereby might have escaped the state's wrath spent against her for her continued immaturity.

### IV.

Finally, it is necessary to briefly discuss the Court's decision not to consider the issue of competency of counsel. When this Court desires to do so, it shows no hesitancy in considering issues not properly raised below. *See, e. g.,* Court files in *State v. Otto*, No. 12714 (where the Court on its own initiative found an issue not even raised on appeal and ordered it briefed); *State v. Cariaga*, 95 Idaho 900, 523 P.2d 32 (1974) (denial of due process not waived even though no objection previously made and issue not raised until supplemental brief ordered by court at oral argument). The penalty to the mother who loses a child termination case is more severe than that imposed in many felony cases. The proceeding is quasi-criminal by the very nature of the beast. That the same standards for competency of counsel should be considered in child termination cases as in criminal cases is an absolutism on which I would not waste ten seconds of consideration.