837 P.2d 319

**In the Interest of John Doe I, and John Doe II, Children Under 18 Years of Age.**

**Jane DOE, Real Party in Interest–Appellant,**

**v.**

**STATE of Idaho, DEPARTMENT OF HEALTH & WELFARE, Real Party in Interest–Respondent.**

No. 19197.

Court of Appeals of Idaho.

Aug. 6, 1992.

Petition for Review Denied Sept. 22, 1992.

Michael J. Wood and John A. Olson, Twin Falls, for appellant. John A. Olson argued.

Larry EchoHawk, Atty. Gen., James Thomas Baird, Deputy Atty. Gen., Boise, for respondent. James Thomas Baird argued.

SUBSTITUTE OPINION

The Court's prior opinion dated July 21, 1992, is hereby withdrawn.

WALTERS, Chief Judge.

This is an appeal by a mother from the decision of the district court affirming a magistrate's judgment terminating her parental rights to her two minor sons. Pursuant to the provisions of Idaho Court Administrative Rule 32, the anonymity of the

participants to this proceeding will be preserved by identifying the appellant in the caption of this case as "Jane Doe" and by referring to her in the text of this opinion as "the mother", to the two children as "John Doe I" and "John Doe II", and to their father as "the father."

The mother argues that there was insufficient evidence that she neglected the children or that severance of the parent-child relationship was in the children's best interest. We affirm.

## Procedural Background

The children in this case, John Doe I and John Doe II, lived with their natural parents from birth until they were removed from the family home by officers of the Buhl police force on July 21, 1988, and placed in the temporary custody of the Department of Health and Welfare (Health and Welfare) the next day. At that time, John Doe I was almost two years of age and John Doe II was about six weeks old. Counsel for the mother notes that on August 12, 1988, the mother signed a stipulation with Health and Welfare that it would receive custody of the children for not more than one year and that renewed custody was granted to Health and Welfare on September 1, 1989, for another period not to exceed one year. Although notes in the record support this information, the stipulations have not been made part of the record on appeal. However, the mother concedes that she signed a stipulation stating that "sufficient facts exist, and are reflected in the record thus far established in this case, to bring the ... children within the purview of the Child Protective Act." A petition for termination of parental rights was filed on January 18, 1990, and a five-day hearing took place between May 3 and May 11, 1990. On May 24, 1990, the trial court entered its Findings of Facts and Conclusions of Law in which it found clear and convincing evidence to terminate the parents' rights. The mother appealed, and the district court affirmed on February 6, 1991. She now appeals to this Court. The father has not appealed.

## Standard of Review

Grounds for termination of a parent-child relationship must be shown by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388, 1403, 71 L.Ed.2d 599 (1982); *In re Aragon*, 120 Idaho 606, 608, 818 P.2d 310, 312 (1991). On appeal, we will not disturb a factual finding to terminate parental rights if the findings are supported by substantial, competent evidence. *In re Aragon, supra.* When reviewing the decision of the trial court, the appellate court will draw all reasonable inferences in support of the court's judgment. *Id.* Where, as here, the issues before the appellate court are the same as those considered by the district court sitting in an appellate capacity, the appellate court will review the trial record with due regard for, but independently from, the district court's decision. *Hentges v. Hentges*, 115 Idaho 192, 194, 765 P.2d 1094, 1096 (Ct.App.1988); *Robinson v. Joint School District No. 331*, 105 Idaho 487, 490, 670 P.2d 894, 897 (1983).

## Standards for Termination

In the context of termination of a parent's rights, neglect is defined as "a situation in which the child lacks parental care necessary for his health, morals or well-being...." I.C. § 16–2005(b). The statute does not require or suggest that a child suffer demonstrable harm before the parent-child relationship can be terminated. *In the Interest of Cheatwood*, 108 Idaho 218, 220, 697 P.2d 1232, 1234 (Ct.App.1985). One of the goals of Idaho's termination statutes is to prevent harm, not just to alleviate it. *Id.* Parental rights also may be terminated if termination is in the best interests of the child. I.C. § 16–2005(e). Although the best interests of the parent need be considered only when termination is sought under I.C. § 16–2005(e), the best interests of the child must be considered when terminating the relationship under *any* provision of I.C. § 16–2005. *See Hofmeister v. Bauer*, 110 Idaho 960, 962 n. 1, 719 P.2d 1220, 1222 n. 1 (Ct.App.1986.)

## Discussion

At the termination hearing, evidence was presented that state and local authorities became involved in this case on the night of July 21, 1988, when the police were called to the parents' home because of a fight between the mother and the father. The two had experienced a very stormy, unstable and sometimes violent relationship since they were married in 1985. They argued constantly, were separated and reunited several times, and the father was sometimes physically violent with the mother. During the three months preceding the night the children were removed from the home, the Buhl police had been called to the family's residence twenty-one times, primarily because of fights between the father and the mother. At least once, however, a neighbor called requesting aid for the oldest child who was playing unsupervised in the middle of the street in front of the house. Although the children were not subjects of the family violence, they were often caught between the warring parents and were at risk of being injured. The mother testified that at least once the father hit her while she was holding one of the children.

On the night which precipitated the state's involvement, July 21, the mother had returned home from work to find that the father was, with the aid of friends, preventing her from seeing her children because he feared for their safety for an imprecise reason. After learning this, the mother contacted the police to get the father removed from the home. Officer Cox, of the Buhl police department, responded shortly after midnight to find the house in complete physical disarray. The mother testified that it looked like a tornado had gone through the home. According to Officer Cox, when he arrived the eight people inside were simultaneously arguing loudly, the father was yelling at the mother from the foot of the stairs, and the mother was screaming back about some welfare checks she believed had been stolen from her wallet. When asked, the father said he was standing at the stairs because he had to "protect my babies." Officer Cox and another policeman went upstairs where the children were located. Officer Cox testified that he found the two boys in a partially finished attic where the temperature was a stifling 100 degrees, by his observation. The children were lying on a filthy blanket and mattress, with bottles of sour smelling milk or formula propped in their mouths. The face of the oldest was covered with insect bites and the youngest, whose skin was pale and clammy, appeared to be having trouble breathing. The officers determined that the children were in a dangerous situation and took them to the police station. When an employee of Health and Welfare arrived, she was so concerned about the children's condition she took them to the emergency room of the nearest hospital. There they were examined, treated, and released to Health and Welfare.

Soon thereafter, the mother and the father stipulated to the temporary placement of the children with Health and Welfare. Subsequently, the responsible parties at Health and Welfare contacted the mother and told her what she would have to do to regain custody of the children.

Further discussion of the mother's involvement with Health and Welfare is best prefaced by examining the testimony of the two psychologists who testified at the hearing. Both psychologists testified that after examining the mother they concluded she suffered from a "mixed" or "borderline" personality disorder. Although the mother is considered intelligent enough to care for the children, her psychological make-up causes her to have an explosive temper, many volatile and unstable relationships with men, to primarily focus on her own problems to the exclusion of others, a refusal to acknowledge responsibility for her acts, and a pronounced tendency to blame others for her problems. One of the psychologists testified that he believed the mother loved her children, but would place her needs before theirs. The same psychologist stated that such disorders are very hard to change and require years of extensive psychotherapy. Even then, the prognosis for change is "guarded."

The psychologists testified that to make progress the mother had to admit she had

problems, yet the evidence presented by Health and Welfare at the hearing established that she refused to do so and blamed everyone else. The mother, however, testified she was learning to recognize her problems, and essentially, that all the evidence Health and Welfare presented was false.

The mother signed two case plans and two contracts with Health and Welfare. The contracts were for 90 and 60 days each and were very similar in their lists of goals the mother had to accomplish and activities from which she had to refrain. The contracts were designed to help her gain general living and parenting skills sufficient to enable her to maintain a stable home. The contracts required the mother to attend nurturing classes conducted by Health and Welfare and to demonstrate knowledge of budgeting, nutrition, behavior management, and child development. They specified visitation periods with the children, that the mother would remain in one safe, clean home for the period of each contract, that she would hold a job for the same time, make enough money to pay her expenses, and attend two Alcoholics Anonymous meetings per week. She was also required not to expose the children to known sexual offenders, and to abide by the recommendations of her psychological assessment and begin counseling to help develop better self-esteem and independence to break her cycle of co-dependency. Each contract stated that the mother's parental rights could be terminated if she did not abide by the contract terms.

At the termination hearing, employees of Health and Welfare testified that the mother had not satisfied the contracts and had provided misleading and incorrect information to make it appear otherwise. Her attendance at the nurturing and parenting classes was perfunctory. The mother reportedly told one of the family services technicians assigned to the case that she was "jumping through the hoops" to satisfy the attendance requirements and regain custody of the children, but that she had no

problems as a parent and refused to participate in or learn from the classes. However, later the mother testified that she only refused to speak at the classes when she had nothing to say.

The record is clear that the mother violated the restriction that she not expose her children to known sexual offenders. In the face of this restriction, the mother entered into a relationship with another man, B.G., who previously had been convicted of child molestation. The mother testified she had heard only that B.G. had been wrongly accused of the crime. However, testimony of the Health and Welfare employees indicates that the mother was aware of B.G.'s past. When Health and Welfare attempted to inform her of B.G.'s history, the mother became very angry, denied his conviction, and stormed out of the office. Evidence was also introduced that the mother tried to hide her relationship with B.G. from Health and Welfare by staying frequently at his home and returning to her home only when Health and Welfare brought the children over for visits. Ultimately, the mother married B.G. after divorcing the father, only to quickly divorce B.G., reportedly because she learned the truth about his conviction. At the termination hearing the mother was pregnant with B.G.'s child.[1] When asked how she would have kept the children safe if she had remained married to B.G., she answered that he would have had to leave or stay away for the four years until his probation was over. It is undisputed that children were "exposed" to B.G., in violation of the contract, at least once.

The requirement that the mother keep one home and a job for the contract periods was based on the mother's history: she and her family had moved thirteen times in four years, at times living with relatives or friends. In the early stages of this case, the mother, the father, and the children were living on the father's income of $600 per month and the mother had been unable to keep a job. The mother reportedly kept a job for the contract periods, although she

1. We note that the record on appeal does not reveal whether the pregnancy was carried to completion and, if so, whether the mother is successfully caring for the child.

was later fired from a position at a local secondhand merchandise outlet. Thereafter, the father was jailed for writing a bad check. At the time of the hearing, the mother was living entirely on public assistance and funds donated by her church. She had not been able to keep a job, support herself or contribute to the support of the children and at the hearing presented poor prospects for increasing her employability.

The mother acknowledged that she was an alcoholic and presented evidence that she had attended the A.A. meetings as required and had even been entrusted to set-up for and close after her twice-a-week meetings. She was never shown to be drunk in front of the children. Although she admitted to being an alcoholic, she testified that she drank relatively little and only in stressful times, and that the alcohol did not affect her abilities as a parent. She presented conflicting information, however, that she had sometimes gone to bars and gotten drunk. The transcript indicates that the trial court had difficulty believing her testimony that her alcoholism stemmed from drinking only an occasional glass of champagne during celebrations.

Every Health and Welfare worker who testified recommended termination. The children's guardian ad litem very definitely believed that the children had been neglected when in the mother's care. Together, these witnesses testified that the best interests of the children would be served by being placed in a permanent, stable home, which could be provided only by termination and adoption. The record indicates that once taken from the mother's care, the children improved dramatically both physically and emotionally. When under another's care, John Doe II, the youngest, changed from being listless as a "ragdoll" to being a happy, inquisitive child. The older boy, John Doe I, who had been described as being angry all the time and nearly uncontrollable, was able to stabilize and improve his moods and behavior.

In her appellate brief, the mother surveys several Idaho cases in which neglect or neglect plus other factors supported termination of parental rights, citing *In the Interest of Bush*, 113 Idaho 873, 749 P.2d 492 (1988); *In the Interest of Brown*, 112 Idaho 901, 736 P.2d 1355 (Ct.App.1987); *Cheatwood, supra,* 108 Idaho at 218, 697 P.2d at 1232; *In the Interest of Holt*, 102 Idaho 44, 625 P.2d 398 (1981); and *State ex rel. Child v. Clouse*, 93 Idaho 893, 477 P.2d 834 (1970). She argues that these cases support termination based on neglect only when there is affirmative abuse with substantiated physical or emotional harm to a child, a history of intervention by Health and Welfare, criminal conduct by the parent, or severe alcoholism which prevents the parent from caring for a child. She also argues that she successfully completed the tasks required by Health and Welfare for the return of her children. She acknowledges, however, that those cases were decided using a very fact-specific analysis, and that each case must rest on its own facts.

■ The facts of this case indicate that when under the mother's care, the children were in an unstable, unnurturing and dangerous environment. In the two years this case took to progress to hearing, the mother had failed to improve her itinerant living arrangements, lack of job prospects, or bleak financial situation. She refused to participate in any of the classes arranged for her by Health and Welfare. At the four nurturing sessions she attended, the mother was always very angry and would rarely focus on the curriculum. To her credit, the mother acknowledged her alcoholism and expressed a desire to obtain her G.E.D. Also, although the record showed little change in the mother's propensity to associate with "high-risk" individuals, she had divorced the father, whom she blamed for the violent and acrimonious atmosphere of the home, and B.G., who presented a serious risk of physical harm to the children. Unfortunately for the mother, the trial court found her to be one of the less credible witnesses, possibly because of the conflicting nature of her explanations and the fact that her testimony paralleled the expert testimony regarding her psychological make-up, that is, that she refused to acknowledge her parenting difficulties and

that other people had caused her problems, not her.

### Conclusion

The trial court found sufficient evidence to support termination of the mother's parental rights based on the conclusion that she had neglected the children and that the children's best interests would be served by termination. Although conflicting evidence was presented, the court found Health and Welfare to be the most credible source of information. The district court agreed, and deferred to the trial court's ability to accurately weigh the evidence and judge the demeanor of the witnesses. We likewise agree with the trial court's findings of facts and conclusions of law, and, construing all reasonable inferences in its favor, we hold that the findings are supported by substantial evidence and that the magistrate's conclusions of law are correctly based upon those findings. Accordingly, we affirm the judgment terminating the parent-child relationship.

No costs or attorney fees are awarded on appeal.

SWANSTROM and SILAK, JJ., concur.