**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**
**Docket No. 41382**

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENTAL RIGHTS OF JOHN (2013-21) DOE. | ) ) ) ) | 2014 Unpublished Opinion No. 461 |
| _____ | ) ) | Filed: April 18, 2014 |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | ) ) ) | Stephen W. Kenyon, Clerk |
| Petitioner-Respondent, | ) ) ) ) | THIS IS AN UNPUBLISHED OPINION AND SHALL NOT BE CITED AS AUTHORITY |
| v. | ) ) | |
| JOHN (2013-21) DOE, | ) ) | |
| Respondent-Appellant. | ) ) | |
| _____ | ) | |

Appeal from the Magistrate Division of the District Court of the Fifth Judicial District, State of Idaho, Minidoka County. Hon. Rick L. Bollar, Magistrate.

Judgment terminating parental rights, <u>affirmed</u>.

Clayne S. Zollinger, Jr., Rupert, for appellant.

Hon. Lawrence G. Wasden, Attorney General; James T. Baird, Deputy Attorney General, Twin Falls, for respondent. James T. Baird argued.

_____

WALTERS, Judge Pro Tem

John (2013-21) Doe (Father) appeals from the judgment terminating his parental rights to his three children. For the reasons that follow, we affirm.

**I.**

**FACTS AND PROCEDURE**

At the heart of this case are three children: Child 1, born in 2007; Child 2, born in 2009; and Child 3, born in 2010 (collectively, the children). They are the children of Father and Jane Doe (Mother).

1

A.      The Child Protective Act Proceedings

In 2009, Mother, Child 1, and Child 2 were involved in a Child Protective Act (CPA) proceeding, Idaho Code §§ 16-1601 to 16-1643.  Father was not yet known to be the father of Child 1 and Child 2 and was not involved in the 2009 CPA proceeding.  Child 1 and Child 2 were removed from Mother's home and placed in a foster home in November 2009.  They were returned to Mother in August 2010, and the case was closed in November 2010.  Shortly thereafter, Father was released from incarceration and Father and Mother shared a home together.

The record does not reveal Father's involvement with the children until late 2010 when Child 3 was born and Father was released from incarceration.  From November 2010 through September 2011, the children were living in a home shared by Father and Mother.  In September 2011, the Minidoka County prosecutor filed a petition under the CPA asking the court to find the children within the jurisdiction of the CPA.  The petition alleged, "The children are at risk of being abused, neglected, and or lacking a stable home environment."  According to the petition, the Department of Health and Welfare (the Department) was referred to Father and Mother's home in late August 2011.  As a result of the visit and subsequent drug testing, it was determined that Child 3 tested positive for methamphetamine.  The children were then placed in shelter care in the same foster home that cared for Child 1 and Child 2 in 2009.  *See generally* I.C. § 16-1608.  A shelter care hearing was held, and as a result of the hearing, the children were placed in the protective custody of the Department.

In October 2011, an adjudicatory hearing was conducted and the magistrate decreed that the children be placed in the protective custody of the Department for an indeterminate period of time.  As required under the October 2011 decree, the Department filed a case plan.  The magistrate approved the case plan and scheduled a review hearing for January 2012.  A status hearing was held in December 2011.  In January 2012, the children were returned to the home shared by Father and Mother, but a decree from a subsequent review hearing ordered that the children remain under protective supervision of the Department.

On June 26, 2012, a probation search was conducted of Father and Mother's home.  Both Father and Mother were arrested for drug-related charges and the children were again placed in the foster home.  The prosecutor moved the magistrate to change the children's status from

protective supervision to protective custody. The magistrate conducted a shelter care hearing and ordered the children to be in the protective custody of the Department.

On July 23, 2012, the magistrate conducted a CPA adjudicatory hearing. As a result of that hearing, the magistrate issued a decree finding aggravated circumstances (the CPA decree), I.C. § 16-1619(6)(d); ordered the children to be in the protective custody of the Department for an indeterminate period of time; and ordered the Department to file a permanency plan, I.C. § 16-1620. The Department filed a permanency plan with the goal of terminating the parental rights and finding an adoptive home for the children. The magistrate approved the permanency plan and scheduled a review hearing for October 15, 2012. After the October 15, 2012, review hearing, the magistrate ordered that the children remain in the protective custody of the Department.

## B.    The Parental-Termination Proceeding

On December 18, 2012, the Department, represented by the State, petitioned the magistrate to terminate Father and Mother's parental rights. The petition alleged that Father "neglect[ed] the children by being on probation and being arrested on probation violations on drug charges for possession of methamphetamines." The petition averred that termination was in the children's best interests because "the parents are unable to provide personal care or maintenance for these children and the best interests of the children would be served by providing them with a financially and emotionally stable home environment such as that which might be provided by adoptive parents."

On July 11, 2013, the magistrate conducted a parental rights termination hearing for both Father and Mother. The State presented testimony from a former child protection worker, the foster mother, Mother's probation officer, Father's probation officer, a social worker (the first social worker), the guardian *ad litem*, and a second social worker. Mother testified on her behalf and Father testified on his behalf. The testimony adduced at the July 11, 2013, hearing and relevant to Father's case is as follows.

In November 2009, Child 1 and Child 2 were removed from Mother's home to a foster home--Father was not yet involved when Child 1 and Child 2 were removed. Then, in August 2010, Child 1 and Child 2 were returned to Mother and subsequently stayed with both Mother and Father, and Child 3 was born in late 2010. Although the children had been removed from the foster mother's home and were back with Father and Mother, the foster mother continued to

3

care for the children two-to-three times per week. In August and September of 2011, Father and Mother expressed to the foster mother that "demons were after them and their children and that their house was possessed," and according to the foster mother, "they were very scared people."

In August 2011, the Department, according to the first social worker, received a call with concerns about substance abuse, hallucinations, and domestic violence regarding Father and Mother. Although the first social worker confronted Father with the allegations, Father denied them, and the first social worker had the children and parents drug tested. Father and Mother along with Child 3 tested positive for methamphetamine. Father stipulated to the Department assuming custody of the children.

At the family unity and case plan meeting following the August 2011 referral, the following issues were identified, according to the first social worker: substance abuse, safe and stable housing, visitation, and legal. The second social worker recalled that the case plan called for Father to complete a substance abuse evaluation, a mental health evaluation and anger management training, and Father needed to provide a safe, sanitary home free of illegal drugs. In addition, Father needed to be employed and follow his probation requirements.

Meanwhile, the three children returned to the foster mother as a result of the drug tests and "[i]t was like coming home" for the children according to the foster mother. During the second period that the foster mother had the children, Father visited but would come unprepared and was sick a few times. The foster mother also recalled that on one occasion Father had come in after playing with the children outside, leaving the children unattended, and the foster mother saw the children in the road.

For his case plan, Father participated in drug testing, completed the necessary evaluations and training, and did maintain a safe, sanitary, and stable home. In addition, the second social worker recalled that Father provided budgets and maintained employment. Given this progress, the children were returned to Father and Mother's home in January 2012 for an extended home visit and were placed under the Department's protective supervision in spring 2012. The foster mother continued contact with the parents, visited the children--sometimes staying a whole week--and babysat the children. The foster mother helped Father and Mother monetarily during the time the children were back with Father and Mother, including purchasing a car for Father and Mother because Father's truck was not fit to transport the children.

4

Then, on June 26, 2012, the first social worker received another referral after a probation check at Father and Mother's home. Additional drug tests were conducted, and Child 2 and Child 3 were positive for methamphetamine. The children were again returned to the foster mother, and she has cared for them since June 26, 2012. While Father was incarcerated following the incident, Father had phone contact with and wrote letters to the foster mother. In addition, Father sent pictures, small trinkets, and books to the children. As of the hearing date, Father had visited his children once in the month since his release from incarceration.

Father's probation officer, although not currently assigned to Father's probation, recalled that Father violated his probation twice for possession of controlled substances--once for the August 2011 incident and once for the June 26, 2012, incident. Father had also participated in three rider programs. During the period Father was under the officer's supervision, Father was cooperative and showed no signs of aggression or violence. As far as Father's probation officer knew, Father was doing well and had a full-time job.

Father testified on his behalf. Father, age twenty-seven at the time of the hearing, started using illegal drugs when he was twenty or twenty-one and had his first conviction for possession of illegal drugs in 2007 or 2008. Father contended he found out he was the father to Child 1 and Child 2 when Mother was working the 2009 CPA proceeding case plan and "started wanting to be part of their lives." Father had been incarcerated until November 2010 and he was on a rider when Child 3 was born. After his rider, Father maintained employment and maintained a house with Mother. When the Department conducted its August 2011 referral, Father stated that he believed the house was haunted. After the Department conducted its August 2011 referral, Father continued to work the case plan and remained clean until June 26, 2012. Father was then incarcerated, but was released a month and a half before the parental rights termination hearing. Father noted that, at the time of the parental rights termination hearing, he had a job and contended that he would be able to maintain a home and take care of the children. Father, though, acknowledged that he was living in a halfway house as a stipulation to his release from jail, but expected to leave the halfway house at the end of July 2013.

Father did not believe it was fair to the children for them to bounce back and forth between his house and the foster house. Father agreed that the children need a home that is safe from drugs and believed drugs were the cause of his problems. According to Father, he changed

and became responsible. He stated he was willing to undertake the effort to work a case plan to show he can establish a stable environment before having the children returned to him.

In addition to Father's testimony, the foster mother, the guardian *ad litem*, and the second social worker opined what would be in the children's best interests. During the time the children were with the foster mother, she noted improvement in all the children, including noticeable progress with Child 2, although Child 2 still required additional development. She also provided records of the children's dental work, medical visits, and immunization updates. The foster mother thought the children need a home that is secure, stating, "They need to be in a loving relationship where they know what's going to happen to them each day of the week."

The guardian *ad litem* opined that termination was in the children's best interests: "The kids need a stable situation. . . . They need stability, they need love, they need guidance, they need safety, and they need to know that when they wake up in the morning they're going [to] be in the same place." When asked if she would change her mind knowing Father would be available to care for the children and that Mother may be out of jail in nine months, the guardian responded, "No. The reason why is there is a drug problem."

The second social worker testified to being familiar with Father's housing situation at the time of the hearing. She believed the halfway house where Father resided was not appropriate for children. In addition, she was of the opinion that it was in the best interests of the children to terminate the parental rights: "These parents love their kids, but they've never been able to show them they can maintain. They can maintain for a little while, but they've shown they can't maintain their sobriety for the long run." The second social worker further opined that the children were doing better as a result of the foster care.

The magistrate issued a decree with findings of fact and conclusions of law. The magistrate determined that the Department had taken reasonable efforts to reunify Father with the children. Moreover, the magistrate found that the State had proven neglect by clear and convincing evidence and that termination was in the best interests of the children. Accordingly, the magistrate ordered Father's parental rights terminated. Father appeals.

## II.

## STANDARD OF REVIEW

For a parental rights termination action, the standard of review was announced by the Idaho Supreme Court:

This Court's standard of review in parent-child termination cases is well settled. On appeal, this Court will not disturb the magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision. Substantial, competent evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. This Court must conduct an independent review of the magistrate court record, but must draw all reasonable inferences in favor of the magistrate court's judgment, as the magistrate court has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive and to judge the character of the parties.

*Doe v. Doe*, 155 Idaho 505, 507, 314 P.3d 187, 189 (2013) (citations and internal quotation marks omitted).

## III.

## ANALYSIS

Father raises three issues on appeal: (1) whether the magistrate erred by finding aggravated circumstances in the CPA decree; (2) whether the magistrate erred by taking judicial notice of prior proceedings including case plans and orders; and (3) whether the magistrate erred by terminating Father's parental rights when Father substantially complied with his case plan. We address these in turn.

### A.     Aggravated Circumstances Finding

Father challenges the magistrate's finding of aggravated circumstances contained in the CPA decree. Father contends the magistrate's findings of chronic drug use and abandonment were erroneous. The State argues that Father has waived the issue due to the untimeliness of the appeal. In the alternative, the State maintains that the finding was supported by evidence. Father asserts that the right to appeal the CPA decree is discretionary and he "chose to wait until the final order terminating the parent/child relationship, which is the final order contemplated by Idaho Appellate Rule 11.1."

Initially, we note that the Idaho Supreme Court has disagreed with the State's waiver argument in *Idaho Dep't of Health & Welfare v. Doe*, ___Idaho ___, 320 P.3d 1262 (2014). The finding of aggravated circumstances in the CPA decree is appealable under Idaho Appellate Rule 17(e)(1)(A) because the CPA decree is an interlocutory order. *Doe*, ___Idaho at ___, 320 P.3d at ___.

Although the aggravated circumstances finding may be reviewed on appeal, we do not reach the merits of Father's arguments. Father's briefing on appeal does not explicitly address

7

what impact an erroneous aggravated circumstances finding would have on the final judgment terminating his parental rights, except to state in the conclusion that Father "should have been afforded the opportunity to reunify with his children." A finding of aggravated circumstances permits the court in the CPA proceeding to vest custody of the children in the Department even though the Department did not take reasonable efforts prior to the CPA proceeding to prevent placement of the children in foster care. I.C. § 16-1619(6)(d). In this case, an erroneous aggravated circumstances finding would have no impact on the CPA decree's vesting of custody with the Department. This is because the magistrate found that reasonable efforts were taken to prevent the placement of the children in foster care. These findings are *not* contested on appeal. Accordingly, the magistrate complied with the statutory requirements in Idaho Code § 16-1619(6), even though the magistrate also found aggravating circumstances.

To be sure, had aggravated circumstances not been found in this case, the Department would have been required to file a CPA case plan, I.C. § 16-1621(1) (2012), but that case plan still could have included efforts to place the children for adoption, I.C. § 16-1621(3), (4) (2012), and the Department still would have had the authority to file a termination petition. Once the court vests custody in the Department under Idaho Code § 16-1619, as the magistrate properly did in this case, "the department *may* petition the court for termination of the parent and child relationship." I.C. § 16-1624(1) (emphasis added). An erroneous aggravated circumstances finding would have no impact on the filing of a termination action in this case because the Department had the authority to file a petition for termination;[1] the termination action is a separate proceeding that we examine apart from the CPA proceeding. Effectively, any error relating to the aggravated circumstances finding in this case is moot, based upon our analysis of the termination of Father's rights. *See Doe II v. Doe III*, 145 Idaho 337, 340, 179 P.3d 300, 303 (2008) (applying the mootness doctrine and concluding that a challenge to a district court's

---

[1]    The salient point to address regarding aggravated circumstances relates to procedure and the authority granted to the Idaho Department of Health and Welfare. Relevant to the Child Protective Act proceeding, the Department is not required to file a case plan when a court has found aggravated circumstances. I.C. § 16-1621. Rather, Idaho Code § 16-1619(6)(d) requires that a permanency hearing be held within thirty days of a finding of aggravated circumstances. If, as a result of the hearing, the court approves a permanency plan with a permanency goal of terminating parental rights and adoption, then the Department is required to file a termination petition within thirty days of the order approving the permanency plan with a permanency goal of terminating parental rights and adoption. I.C. § 16-1624(2); *but see* I.C. 16-1624(3).

denial of the grandparents' action seeking custody of the grandchild was moot because the grandparents were subsequently awarded guardianship over the grandchild).

## B. Judicial Notice

Father joins in an issue raised by Mother: whether the magistrate erred by taking judicial notice of prior proceedings including case plans and orders. The extent of Mother's argument is a reference to one finding of fact made by the magistrate and a general statement from Mother: "We can only question whether there are recollections of some sort from prior proceedings, which are not allowed in the determination by the Court." The State, on the other hand, maintains there was "extensive testimony" in the record for the magistrate to make his findings.

At the beginning of the parental rights termination hearing, the State moved the court to take judicial notice of the "two adjudicatory hearing orders and the case plans that arose out of those." Mother's attorney objected and Father's attorney joined in the objection. The magistrate acknowledged that the State still had to meet its burden of proof, but announced that he would take judicial notice of the requested documents. Following a mid-day recess in the parental rights termination hearing, the magistrate announced that he was correcting a portion of his denial of Mother's attorney's objection to the motion for judicial notice and stated, "No part of the court's record in the proceeding under the Child Protective Act can be used for purposes of meeting the petitioner's burden of proof in the trial on the petition to terminate."

In a parental rights termination proceeding, the Idaho Rules of Evidence apply. Idaho Juvenile Rule 48(b). Idaho Juvenile Rule 48(b) states:

> [N]o part of the court's record in the proceeding under the Child Protective Act may be used for purposes of meeting the petitioner's burden of proof in the trial on the petition to terminate parental rights, unless the part offered is admissible under the Idaho Rules of Evidence, or unless the parties stipulate to its admission.

Idaho Rule of Evidence 201 authorizes judicial notice of adjudicative facts. Adjudicative facts are those that are generally known within the territorial jurisdiction of the trial court or those capable of accurate and ready determination. I.R.E. 201(b); *State v. Doe*, 146 Idaho 386, 387, 195 P.3d 745, 746 (Ct. App. 2008). Generally, when a party moves for the court to take judicial notice, it must specify which documents or items the party is requesting the court to take notice of and must provide a copy of those documents to the court and parties. I.R.E. 201(d). Rule 201 requires certain formalities for a court to take judicial notice of facts that were presented outside of the present hearing, but does not prohibit a judge from taking notice that prior cases have been

9

conducted. If we find an evidentiary error that may impact a factual finding, we review the error to determine if the error was harmless. *See Doe I v. Doe*, 138 Idaho 893, 906-07, 71 P.3d 1040, 1053-54 (2003) (concluding that certain factual errors were harmless, even if they were clear error).

We begin with Mother's general statement in her brief questioning "whether there are recollections of some sort from prior proceedings, which are not allowed in the determination by the Court." It is apparent from the factual findings in the magistrate's memorandum decision that the magistrate utilized the testimony adduced at the parental rights termination hearing--over two hundred pages of trial transcript--as the basis for his determination. Accordingly, we cannot say that the court erroneously took judicial notice of "recollections of some sort from prior proceedings" because the factual findings made by the magistrate were based on the testimony at the termination hearing.

As for the specific factual finding referenced by Mother, the magistrate found by clear and convincing evidence that "[t]he parents were experiencing hallucinations and displaying aberrant behavior." During the termination hearing, the first social worker testified as to the 2011 referral: "The Department received a call of some concerns in regard to the three . . . children. The concern was that [Mother and Father] were allegedly using methamphetamine and bath salts, spice, just some different drugs, that they were hallucinating . . . ." Both Mother and Father also testified that they believed their house was haunted by ghosts. Even assuming the magistrate erred by improperly taking judicial notice of "recollections of some sort from prior proceedings" (or by not clarifying that the parents were *alleged* to be experiencing hallucinations during the 2011 referral), we are persuaded that any error relating to the hallucinations finding was harmless.

## C.    Termination of Parental Rights

Father challenges the magistrate's finding of neglect and finding that termination was in the children's best interests. Father argues that it was "impossible to prevent termination" because he was not offered an opportunity for reunification. Additionally, Father maintains that he "substantially complied" with his case plan and that financial reasons were the basis for the termination. Father contends he was in a position to take care of his children and he has always maintained employment and housing for the children. In contrast, the State argues it has proven

10

by clear and convincing evidence that Father neglected his children and that termination was in the best interests of the children.

A court may terminate a person's parental rights if it finds: (1) a statutory ground exists for termination; and (2) termination is in the best interests of the child. I.C. § 16-2005; *Idaho Dep't of Health & Welfare v. Doe*, 152 Idaho 953, 957, 277 P.3d 400, 404 (Ct. App. 2012). One statutory ground for termination is finding the child is neglected. I.C. § 16-2005(1)(b). A neglected child is defined, in relevant part, as a child:

> (a) Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them; . . . or
>
> (b) Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being[.]

I.C. § 16-1602(26); *see* I.C. § 16-2002(3)(a). Neglect may also occur where:

> The parent(s) has failed to comply with the court's orders or the case plan in a child protective act case and:
>> (i) The department has had temporary or legal custody of the child for fifteen (15) of the most recent twenty-two (22) months; and
>> (ii) Reunification has not been accomplished by the last day of the fifteenth month in which the child has been in the temporary or legal custody of the department.

I.C. § 16-2002(3)(b). A court may also consider the events resulting in the child being placed in foster care when determining whether there was neglect. *Dep't of Health & Welfare v. Doe*, 145 Idaho 662, 665, 182 P.3d 1196, 1199 (2008).

Once a statutory ground for termination has been established, the trial court must next determine whether it is in the best interests of the child to terminate the parent-child relationship. *Tanner v. Dep't of Health & Welfare*, 120 Idaho 606, 611, 818 P.2d 310, 315 (1991). Expert testimony is not required to establish that termination would be in the child's best interests. *Doe I v. Roe*, 133 Idaho 805, 809, 992 P.2d 1205, 1209 (1999). When determining whether termination is in the child's best interests the trial court may consider the stability and permanency of the home, unemployment of the parent, the financial contribution of the parent to the child's care after the child is placed in protective custody, improvement of the child while in foster care, the parent's efforts to improve his or her situation, and the parent's continuing

11

problems with the law. *Doe*, ___Idaho at ___, 320 P.3d at ___; *see Doe I*, 133 Idaho at 809-10, 992 P.2d at 1209-10; *Doe v. Dep't of Health & Welfare*, 122 Idaho 644, 648, 837 P.2d 319, 323 (Ct. App. 1992). A finding that it is in the best interests of the child to terminate parental rights must still be made upon objective grounds, supported by substantial and competent evidence. *Doe*, 152 Idaho at 957, 277 P.3d at 404.

In this case, the magistrate found that Father's use of controlled substances and involvement in the August 2011 matter was established by the evidence. In addition, Father's testimony revealed that Father had felony convictions and Father had, on three occasions, been offered a rider program for noncompliance with his probation. Even at the time of the hearing, the magistrate found that Father's release did not allow Father to care for his children as Father was currently residing in a halfway house. The magistrate determined that it would be in the best interests of the children to terminate Father's parental rights because of Father's "history of involvement with controlled substances, his periods of incarceration and noncompliance with probation, and the protracted periods of time when he has been incapable or unable to properly care for the health and safety of his children." The magistrate also determined that Father "failed to consistently maintain a safe, stable, drug free home" while the children were in Father's custody. Father's periods of incarceration, according to the magistrate, resulted in the inability of Father to discharge his parental responsibilities. "As a result of that inability, the children lack the parental care necessary for their health, safety or well-being . . . ." From these findings, the magistrate determined the children were being neglected.

We are persuaded that the magistrate's finding of neglect is supported by substantial and competent evidence. The testimony at the termination hearing revealed two instances of concern during the time Father had custody of the children: November 2010 through September 2011 and January 2012 through June 2012. In each instance, at least one of the children tested positive for methamphetamine and the children were sent to foster care. Simply put, Father did not maintain a drug-free environment for the children. Father himself acknowledged his drug use, testifying that he had been using drugs for at least six years prior to the hearing. Father's probation violations and past criminal conduct, relating to drugs, also support the finding of neglect. Moreover, Father's conduct during the two time periods resulted in an unsafe and unstable home for the children. These factors, when considered together, are the substantial and competent evidence that form the finding of neglect. *See Doe*, 145 Idaho at 665, 182 P.3d at

1199 (affirming the district court's decision affirming the magistrate's finding that the children were neglected based on several factors). Even though the magistrate based his finding of neglect on Idaho Code § 16-2002(3)(a), the magistrate was also allowed to consider Father's failure to complete his October 2011 case plan. *Idaho Dep't of Health & Welfare v. Doe*, 151 Idaho 356, 365, 256 P.3d 764, 773 (2011) ("Therefore, it is not error for a magistrate court to make a finding of neglect pursuant to I.C. § 16-2002(3)(a), based on noncompliance with a case plan, where such evidence supports a finding of conduct constituting neglect as defined in either I.C. §§ 16-1602(25)(a) or 16-1602(25)(b)."). In this case, the June 26, 2012, incident not only meant Father failed his case plan, but Father also violated his probation as a result of the paraphernalia possession and was incarcerated, making him unavailable to care for the children. Housing was also an area of concern, as Father, as of the date of the termination hearing, could not provide adequate housing for the children. Considering all of these facts, the magistrate's finding that the children were neglected is supported by substantial and competent evidence.

We are also persuaded that the magistrate's finding that termination of Father's parental rights would be in the best interests of the children is supported by substantial and competent evidence. The evidence shows that Father failed to demonstrate an ability to safely parent the children, failed to follow through with the case plan, used illegal drugs, and committed probation violations. Moreover, Father did not provide a safe environment for the children. Conversely, the children have developed a loving and stable bond within the foster home. The foster mother testified that she provided dental, medical, and updated immunizations to the children. The children have improved while in the foster home. Furthermore, the foster mother, the second social worker, and the guardian *ad litem* all opined that termination was in the best interests of the children so that the children may have stability. Undoubtedly, Father loves his children, as several witnesses testified to at the termination hearing, but the magistrate's determination that it would be in the best interests of the children to terminate Father's parental rights is supported by substantial and competent evidence.

Father's arguments as to why the magistrate's findings are not supported by substantial evidence are inapposite. As we determined above, the magistrate complied with Idaho Code § 16-1619(6) in the CPA decree by finding that the Department had taken reasonable efforts to prevent the placement of the child in foster care. Therefore, even if the magistrate had not found aggravating circumstances, the Department would have had the authority to file a termination

13

petition.  Moreover, the bulk of the evidence supporting the finding of neglect was based on events occurring prior to when Father would have been offered a chance for reunification.  To be sure, Father was proceeding with his 2011 case plan, provided housing, and maintained employment.  But Father relapsed and violated his probation and was subsequently incarcerated.  In addition, when the termination hearing was held, Father lacked suitable housing, even though Father had been released from incarceration.  The magistrate's reasoning for finding neglect and finding termination to be in the best interests of the children does not explicitly rely upon financial reasons as the basis for the termination, nor do we infer such a basis from the magistrate's decree.

## IV.

## CONCLUSION

Although we conclude that Father has not waived his appeal of the aggravated circumstances finding, we do not reach the merits of Father's arguments.  Even if the aggravated circumstances finding was erroneous, the Department still had the authority to petition for termination of Father's parental rights.  Any error relating to the aggravated circumstances finding is effectively moot, based on our analysis of the termination action.

We are persuaded that the magistrate did not take improper judicial notice of the CPA proceedings; rather, it is apparent from the factual findings in the magistrate's memorandum decision that the magistrate utilized the testimony adduced at the parental rights termination hearing.  As to the specific factual finding cited by Mother and Father, we are persuaded that any error was harmless.

Finally, we conclude that the magistrate's finding of neglect and finding that termination was in the best interests of the children are supported by substantial and competent evidence.  Accordingly, we affirm the magistrate's judgment terminating Father's parental rights to the children.

Judge LANSING and Judge MELANSON **CONCUR.**