**\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\***

**Electronically Filed
Supreme Court
SCWC-19-0000704
02-SEP-2025
08:43 AM
Dkt. 133 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

In the Matter of the Application of
PIONEER MILL COMPANY, LIMITED,
to register title and confirm its title to land situate at
Lāhainā, Island and County of Maui, State of Hawai'i,
and
KAHOMA LAND LLC,
Substituted Applicant as to Lots 1, 2 and 3A

_____

SCWC-19-0000704

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-19-0000704; LD. CT. APP. NO. 439 amended;
LD. CT. CASE NO. 09-0300)

SEPTEMBER 2, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, AND DEVENS, JJ., AND
CIRCUIT JUDGE KAWASHIMA, IN PLACE OF GINOZA, J., RECUSED

OPINION OF THE COURT BY McKENNA, J.

## I.   Introduction

This appeal concerns a land court application filed in 1919, not prosecuted for decades at a time, then summarily decided 100 years later.

In 1919, Pioneer Mill Company, Limited ("Pioneer Mill") [1] filed land court Application No. 439 ("land court application") to register fee simple title to land in Lāhainā, Maui. The land was identified as Lots 1 (Puou), 2 (Kuholilea), and 3 (Kuhua, Aki, Pu'uki). Pioneer Mill asserted it had title to the parcels through deed or adverse possession. Decades later, Lot 3 was divided into Lots 3A through 3E.

The adverse possession claim as to Lot 3A is the subject of this certiorari proceeding.

A 1919 report by the Examiner concluded that Pioneer Mill held paper title to Lots 1 and 2 but did not have good paper title to Lot 3. The Examiner said Pioneer Mill may have acquired Lot 3, which includes Lot 3A, by adverse possession, indicating adverse possession was not clear.

Charles Kana'ina ("Kana'ina")[2] was identified as the last owner holding title to Lot 3A. His heirs at his 1877 death included Princess Ruth Ke'elikōlani and Princess Bernice Pauahi

---

[1]     Kahoma Land LLC ("Kahoma") substituted for Pioneer Mill in 2009. Pioneer Mill and Kahoma are sometimes collectively referred to as the "Applicants." It appears Pioneer Mill itself went through some business organization changes that are immaterial to our disposition.

[2]     Kana'ina was an ali'i and was the father of William Charles Lunalilo, who became the sixth and first elected monarch of the Kingdom of Hawai'i. The title documents referenced in this opinion do not include 'okina and kahakō and we do not include them when quoting the documents. But we attempt to provide appropriate diacritical marks in the text of our opinion. We apologize for any inadvertent errors.

Bishop.  The record does not reflect any attempt to personally serve the land court application on his heirs or their descendants.  A great majority of interests held by his heirs' descendants were defaulted by the land court after various attempts to serve by publication.  Some apparent descendants of the heirs of Kana'ina ("Kana'ina descendants") appeared at various times during this 100-year saga to challenge Pioneer Mill's (and its successors') claims.

The 1919 land court application was not prosecuted for decades at a time.  There was a trial in 1967, but this court nullified Judge Samuel P. King's decision in 1972, and the matter was remanded for a new trial.  No trial took place after 1972, with long periods of dormancy.  The land court application was decided in 2019 and 2020, when the land court filed three documents.  The first awarded fee simple title to Lots 1 and 2 to Pioneer Mill's successor based on paper title.  The second and third awarded a 78.704% interest in Lot 3A based on adverse possession, the remaining 21.296% representing interests of Kana'ina descendants who appeared in the case and contested the claim.  These three documents are:

1. Amended Decree No. 2016 of May 27, 2020 (awarding Lots 1 and 2 to Kahoma based on paper title)("Decree 2016");
2. September 24, 2019 "Findings of Fact, Conclusions of Law regarding Orders Filed on February 13, 2018 and May 2, 2018" (finding Kahoma has a 78.704% interest in Lot 3A based on adverse possession)("September 24, 2019 FOF/COL"); and

3

3.    Amended Decree No. 2017 of May 27, 2020 (awarding Kahoma 78.704% of Lot 3-A) ("Decree 2017")

On appeal, the Intermediate Court of Appeals ("ICA") affirmed.

Petitioners on certiorari allege several errors.

We discern no genuine issues of material fact regarding paper title to Lots 1 and 2, and we therefore affirm the ICA and land court regarding Decree 2016.

With respect to Lot 3A, however, we address two dispositive errors raised on certiorari.

First, contrary to the ICA, we hold that petitioners on certiorari, as cotenants of Kana'ina heirs, had standing to also defend their cotenants' title against the adverse possession claim.

Second, we hold that, in any event, the adverse possession claim as to Lot 3A should have been dismissed based on laches. Laches requires two essential elements: (1) an unreasonable delay by the plaintiff in bringing or advancing the claim, and (2) resulting prejudice due to the delay.

We hold that the 100-year delay in deciding the Lot 3A adverse possession claim was blatantly unreasonable. Also, Kana'ina descendants were prejudiced because witnesses, including Kana'ina descendants themselves, as well as their knowledge of facts concerning the alleged adverse possession of Lot 3A before

1919, were gone. Therefore, the land court abused its discretion in denying the certiorari petitioners' 2015 and 2016 motions to dismiss based on laches.

Hence, we vacate the ICA's July 17, 2024, judgment on appeal to the extent it affirmed the land court's decisions as to Lot 3A. In other words, we vacate the land court's September 24, 2019, FOF/COL as well as its Decree 2017 awarding 78.704% of Lot 3A to Kahoma. We affirm the ICA's judgment on appeal to the extent it affirmed the land court's Decree 2016 regarding paper title to Lots 1 and 2.

We remand to the land court for further proceedings consistent with this opinion, which is to include dismissal of the land court application as to Lot 3A. Although this dismissal is without prejudice, if a new application to quiet title as to Lot 3A is filed, current Hawaiʻi law will govern.

## II. Background

### A. Factual background and filing of land court application

In June 1919, Pioneer Mill filed the instant land court application to register and confirm fee simple title to the following five land parcels in Lāhainā: (1) the whole of "Puou," a portion of Apana 2 of Land Commission Award 8520 to Josua Kaʻeo, Lot 1 (104.5 acres); (2) three-eighths of "Kuholilea," a portion of Apana 26 of Land Commission Award 6559-B to W.C. Lunalilo, Lot 2 (166.5 acres); (3) the whole of "Kuhua," a

portion of Land Commission Award 7582 to Eseta Kipa, now Lot 3A; (4) "Aki," a portion of Land Commission Award 11216 to Kekau'ōnohi and Grant 3584 to P. Isenberg and C.F. Horner, now Lots 3B and 3C; (5) "Pu'uki," a portion of Land Commission Award 11292 to Mamaki, now Lots 3D and 3E.

Pioneer Mill asserted two bases for its claims to these parcels: (1) via deed from P. Isenberg and C.F. Horner, recorded June 29, 1895, in the Office of the Registrar of Conveyances of the Territory of Hawai'i; and/or (2) via adverse possession.

At the time, Pioneer Mill sought to register and confirm title to "Kuhua," "Aki," and "Pu'uki," as one parcel identified as Lot 3 which, altogether, totaled 1,529 acres. It was not until decades later that Lot 3 was divided into Lots 3A through 3E. On certiorari, we focus on Lot 3A, Kuhua, a portion of Land Commission Award 7582 to Eseta Kipa. The Kuhua parcel, Lot 3A, consists of 240.90 acres.

With respect to the background of the Kuhua parcel, in An Act Relating to the Crown Government and Fort Lands, June 7, 1848, King Kamehameha III reserved the ahupua'a of Kuhua I and Kuhua II as private lands for the use of himself, his heirs, and successors.[3]

---

[3] Apparently, there were four different parcels known as Kuhua - the one owned by Eseta Kipa, at issue here, one owned by Princess Ruth Ke'elikōlani, and two known as Kuhua I and Kuhua II that were part of the Mahele and reserved for King Kamehameha III. Again, the "Kuhua" addressed in this case

In 1855 Eseta Kipa received Land Commission Award 7582 giving her title to Kuhua – Lot 3A and upon her death, title to all her lands vested in her sole heir, Levi Ha'alelea.  Levi Ha'alelea deeded portions of Eseta Kipa's estate to others and devised the remainder to two devisees: (1) Charles Kana'ina and (2) Hazaleleponi K. Kapakuhaili, who subsequently deeded her interest to Charles Kana'ina.

In 1877, Charles Kana'ina died intestate.  His estate was probated.[4]  His heirs and their interests were identified as:

| | | |
|---|---|---|
| 2/9th | Bernice Pauahi Bishop | |
| 1/9th | Ruth Keelikolani | |
| 1/9th | Hana Lilikalani, Edward Lilikalani, and Naihe | |
| 1/9th | A.W. Halilio, Levi Haalelea and Kahuakaiola | |
| 1/9th | Pahau | |
| 1/9th | Kaaua | |
| 1/9th | Heirs of Kilinahe | |
| | 1/36th | KAIAPOEPOE (=2.777%) |
| | 1/36th | Nahuhuleua & Namilimili, wife and husband |
| | 1/36th | NAMAKALELE (=2.777%) |
| | 1/36th | PUAHI (=2.777%) |
| | | 1/9th Heirs of unidentified person |
| | 1/45th | KAHONU (=2.222%) |
| | 1/45th | Kukahiko |
| | 1/45th | Heirs of Kaupae |
| | | 1/135th PAMAHOA (=0.741%) |
| | | 1/135th Kaneikolia |
| | | 1/135th Maele |
| | 1/45th | Heirs of Kaeakamahu: Kaupae, Kalepa, Maihui |
| | 1/45th | Kamakamohaha |

---

is the whole of "Kuhua," a portion of Land Commission Award 7582 to Eseta Kipa, Lot 3A.

[4]     Probate No. 2426

**B.    Land court proceedings before the 1972 remand**

   **1.    Before the 1967 trial [1919-1967]**

On July 8, 1919, the land court appointed Arthur Smith as Examiner of Titles[5] to investigate records relating to Pioneer Mill's application and to file a report regarding title to the subject parcels.  Smith's Report of Examiner, dated December 1, 1919, concluded that Pioneer Mill: (1) had paper title to all of Lot 1 in fee simple absolute; (2) had paper title to three-eighths of Lot 2 in fee simple absolute; (3) did not have good paper title to "Kuhua" (Lot 3A), but it may have acquired it by prescription; (4) did not have good paper title to "Aki" (Lots 3B and 3C); and (5) did not have good paper title to "Puʻuki" (Lots 3D and 3E).

---

[5]    In 1919 Revised Laws of Hawaiʻi ("RLH") Act 56, section 12 (1903) provided:

> **Examiners of Title; appointment, removal.**  The Judge of land registration may appoint one or more examiners of title in the first judicial circuit, or when necessary in any other judicial circuit, who shall be persons of good moral character and shall have been declared by the supreme court of the Territory to be qualified for said office after examination in term or vacation.  They shall be subject to removal by the supreme court of the Territory.

Hawaiʻi Revised Statutes ("HRS") § 501-11 (2018) currently provides:

> **§501-11  Examiners of title; appointment, removal.**  The [land court] judge may appoint one or more examiners of title in the first judicial circuit, or when necessary in any other judicial circuit, who shall be persons of good moral character, and shall have been declared by the supreme court to be qualified for the office after examination.  They shall be subject to removal by the supreme court.

On June 2, 1920, the land court ordered that notice of Pioneer Mill's application be provided by registered mail[6] and publication in the Wailuku Times.  After publication, five respondents appeared and filed answers: (1) Thomas Duncan, who claimed ownership to a one-third undivided interest of all the land in Pioneer Mill's application; (2) the Territory of Hawai'i, which claimed ownership of Lot 3; (3) Titus Napoliona (aka Titus Napoleon), who claimed Pioneer Mill had no title to Lots 2 and 3; (4) J.H.S. Kaleo, who claimed Pioneer Mill had no title to Lots 2 and 3; and (5) Kaneikolia (W) who claimed Pioneer Mill had no title to Lots 2 and 3, to which she claimed an undivided interest.

On September 23, 1920, the land court entered default against all parties who had failed to respond to Pioneer Mill's application by July 3, 1920.

But then, for decades, nothing happened in the application. In 1935 and 1941, ten respondents appeared and moved to re-open

---

[6]    The record shows that service by registered mail was effectuated, but there are no receipt records.

HRS § 669-3 (2016) now provides:

> **Notice by publication or registered mail.**  In any action brought under section 669-1(a) or (b)[adverse possession], unknown persons and <u>any known persons who do not reside within the State or cannot after due diligence be served with process within the State may be served as provided by [other sections].</u>

In other words, when possible, personal service would now be required.

the September 23, 1920, default. These respondents included Lucy Moeikauhane, et al., who filed an answer and claim on August 9, 1935, and Hattie Chun Fook, et al., who also filed an answer and claim on November 22, 1935. It is unclear what happened to the motions to re-open,[7] but aside from them being filed, the case remained inactive from 1920 to 1965.[8]

On March 2, 1965, the State of Hawai'i ("State"), not Pioneer Mill, moved for the matter to be set for trial. The land court issued a publication notice, which appeared in the Honolulu Advertiser and the Sunday Star-Bulletin and Advertiser, setting trial for August 31, 1965. The notice said that all those who failed to appear would have default entered against them. Essentially, the land court re-opened the 1920 default proceeding with the August 31, 1965, trial date serving as a new return date.

Several respondents did appear on August 31, 1965, and the land court later entered default against all those who failed to appear. In May of 1966, the Estate of John Mamaki filed a

_____

[7]   The record consists of least 85 volumes of a record on appeal that are not necessarily filed in chronological order, consisting of thousands of unpaginated pages, making it difficult to follow. This is another consequence of the lengthy delay.

[8]   In 1961, American Factors, Ltd. ("Amfac") apparently had the assets of the original Pioneer Mill conveyed to a newly formed Pioneer Mill Company Limited, and the latter was apparently merged into Amfac, but Amfac does not appear to have been included as a party.

motion to set aside the default.  The land court set aside the default against both the Estate of John Mamaki and the Estate of Mary K. Sylva (aka Mary M. Brown), allowing them to appear as respondents.

**2.    1967 trial and its aftermath**

On September 25, 1967, trial commenced.[9]  On that day, Judge King dismissed the claims of Lucy Moeikauhane, et al., and Chun Fook, et al., without prejudice, who had moved to set aside defaults and filed claims in 1935, finding they did not claim interest through any of Charles Kana'ina's heirs.  This left Titus Napoleon, the Estate of John Mamaki, and the Estate of Mary M. Brown, aka Mary K. Sylva, as challengers of Pioneer Mill's application.

On November 15, 1967, Judge King orally ruled from the bench.  But he also stated that the decision would be effective upon filing of the decision and order.  No written decision was filed at the time.

Then, on February 3, 1970, Judge King publicly declared his candidacy for the position of governor.  Application of Pioneer Mill Co., 53 Haw. 496, 497-98, 497 P.2d 549, 550-51 (1972).

After this announcement, on March 13, 1970, Judge King entered a written decision containing 107 findings of fact and

---

[9]    The Honorable Samuel P. King presiding.

conclusions of law regarding the land court application. He concluded that Pioneer Mill was the owner in fee simple of Lots 1, 2, 3A, 3B, 3C, but not 3D and 3E, and ordered amendments to the maps to divide Lot 3 into those separate parcels. On April 16, 1970, the State Surveyor amended the map pursuant to this order.

## C. Initial appeal

In April of 1970, the State and the estates of Mary K. Sylva (aka Mary K. Brown) and John Mamaki appealed.

Their appeal was based on the land court's refusal to grant their request to dismiss the application "because the issues had not been framed within a certain time." Application of Pioneer Mill Co., 53 Haw. at 498, 497 P.2d at 551. In other words, even more than fifty years ago, parties had sought dismissal based on a failure to prosecute.

Instead of addressing the delay issue, this court requested supplemental briefing regarding "a more basic issue . . . posed by the Land Court judge's announcement relating to his candidacy for public office[.]" Id. At the time, Article V, Section 3 of the Hawai'i Constitution provided that "[a]ny justice or judge who shall become a candidate for elective office shall thereby forfeit his office." Haw. Const. art. V, § 3.

Based on this provision, after supplemental briefing, this court went on to hold that Judge King lacked the power to

execute decisions after he declared his intention to run for public office and nullified his decision regarding this land court application. Application of Pioneer Mill Co., 53 Haw. at 497-98, 497 P.2d at 550-51.

This court then remanded the case for a new trial. Application of Pioneer Mill Co., 53 Haw. at 498, 497 P.2d at 551. A trial never took place.

**D.   Land court proceedings after 1972 remand**

**1.   1972 to 2008**

After the remand, nothing happened in the case, this time for another ten years. In 1982, the land court, not Pioneer Mill, initiated a status conference with counsel, and set trial for April 1983.

Between the setting of trial and March 1983, six motions to set aside default and for leave to file answer were filed. On April 22, 1983, disclaimers of interest were filed regarding five of the six motions to set aside default. The last motion to set aside default was resolved by a stipulation entered between Myrtle N. Lee ("Lee") and Pioneer Mill, which withdrew the motion to set aside default and substituted Lee as a party.

But for reasons unknown, trial did not take place in April 1983. On September 29, 1983, the land court sent a letter to Cades, Schutte, Fleming & Wright ("Cades"), which represented Pioneer Mill, and another to Lee, regarding a new trial date of

November 25, 1983.  Then, on October 20, 1983, another letter was filed by the land court, this time addressed only to Cades, saying that the trial was again being rescheduled to January 13, 1984, per Pioneer Mill's request.

And yet another decade elapsed without any action in the case.  In late 1993, the State filed a disclaimer and stipulation between itself and Pioneer Mill; the State disclaimed any interest in Lots 1, 2, 3A, 3B, and 3C, and stipulated that Pioneer Mill had title suitable for registration to these lots.  Apparently as part of this stipulated disclaimer, in 1994, Pioneer Mill quitclaimed Pu'uki, Lots 3D and 3E, to the State.

### 2.    2009 and Kahoma's substitution motion

Once again, nothing happened in the case, this time for more than fifteen years.  Pioneer Mill had apparently transferred Lots 1, 2, 3A, 3B, and 3C to Kahoma on August 28, 2000.  And on December 21, 2006, Kahoma sold Lots 3B and 3C to Frank Valenta.

But Kahoma waited nine years after it obtained title, until July 14, 2009, to move for it be substituted for Pioneer Mill as the applicant on the land court application as to Lots 1, 2, and 3A.  On August 28, 2009, the land court granted the motion.

### 3. Kahoma's motions for default and summary judgment

Then, on November 2, 2009, Kahoma filed a motion for default judgment as to Lots 1, 2, and 3A, Kuhua. On December 24, 2009, the land court ordered publication of notice of its intent to grant the motion. The publication was advertised in the Maui News and the Honolulu Star Advertiser with a return date of March 29, 2010. The publication did not identify who might be a claimant, i.e., whose descendants' interests might be at issue. It merely invited those with objections to either file written objections or appear on that date to orally object.

Some objections were filed over the months leading up to the hearing. On October 21, 2010, the court initially denied the motion for default judgment and ordered that any interested party now had until November 1, 2010, to file a claim of interest. Additional claims of interest were filed.

Then, in April 2011, Kahoma filed a motion for entry of default against all parties who failed to file a claim of interest by the November 1, 2010, deadline. On November 15, 2011, the land court granted this motion and entered default for those who had not met that deadline.

In the interim, on August 3, 2011, Kahoma filed a motion for summary judgment requesting confirmation and allowing registration of its title to Lot 1, outlining the chain of title as to that lot. On October 26, 2011, the land court granted the

15

motion, confirming Kahoma's ownership in fee simple to Lot 1 and ordered registration of Kahoma's title, but denied Kahoma's request for Hawai'i Rules of Civil Procedure ("HRCP") Rule 54(b) certification.

In July of 2012, Kahoma moved for summary judgment to confirm its title to Lot 2. Kahoma asserted it had unbroken title as to that lot also. On January 16, 2013, the land court granted this motion.

### 4. Motions to dismiss based on laches/lack of prosecution

On November 19, 2015, self-represented certiorari petitioner Edward Kakalia ("Kakalia") filed a motion asserting the case had been pending for too long.[10] No order appears to have entered regarding this motion, but it was implicitly denied as the land court went ahead and later ruled on the merits.[11]

On July 29, 2016, some other Kana'ina descendants, who are also petitioners on certiorari (collectively referred to as "Schneider descendants" based on Gladiola Aloha Schneider being the first named), filed a motion to dismiss based on laches as well as HRCP Rule 41(b). Schneider descendants argued that laches bars stale claims, especially when material witnesses

---

[10] "Taking to[o] Long; On the Brief; Allodial Title Undisputed; Respondents Interest; No Adverse Claim; Conclusion; Summary Judgment."

[11] On August 16, 2017, Kakalia filed another motion, this one seeking dismissal with prejudice based on the merits regarding the adverse possession claim as to Lot 3A, which was denied.

have passed away. They also argued that the case should be dismissed based on HRCP Rule 41(b) based on the failure to prosecute, arguing that the delay was deliberate and contumacious. The land court denied this motion on December 13, 2016.

5.   **Kahoma's motion to confirm undivided 78.704% interest in Lot 3A**

Then, on January 17, 2017, Kahoma filed a motion seeking confirmation of a 78.704% interest in Lot 3A by adverse possession. The motion asserted that by the November 1, 2010, deadline set by the land court for filing claims of interest to Lot 3A, claims totaling a 21.296% interest had been filed by Kana'ina descendants.

Kahoma requested that the land court enter a decree giving Kahoma title to the remaining 78.04%. This percentage represented the interests of defaulted Kana'ina descendants. Kahoma said if the motion was granted, it would stipulate to the substitution of Kana'ina descendants who had filed claims as applicants to the remaining undivided 21.296% interest in Lot 3A. Kakalia opposed, raising various concerns, including that he, as well as other descendants, were entitled to a fair trial and reasserting that the case had been pending for more than 90 years. Various Kana'ina descendants also opposed this motion.

On May 17, 2017, the land court issued an order saying that "default judgment against the non-appearing parties whose defaults have been previously entered herein as to Lot 3-A is granted, but subject to a determination of Substituted Applicant Kahoma Land LLC's interest, if any[.]" The order denied without prejudice Kahoma's request to register ownership to 78.04% of Lot 3A.

Kahoma then moved for an interlocutory appeal of the May 17, 2017, order, which the land court denied. But in its denial, the court indicated it would entertain a motion for reconsideration. Kahoma then filed a motion for reconsideration on July 18, 2017. The land court then granted Kahoma's motion for reconsideration and entered default judgment for Kahoma as to 78.704% of Lot 3A. Motions for reconsideration were filed by various descendants, but all were denied.

6.  **Land court's findings and decrees**

The land court then filed its September 24, 2019, FOF/COL and its Decree 2017 granting Kahoma a 78.04% interest in Lot 3A based on adverse possession, as well as its Decree 2016 confirming Kahoma's paper title to Lots 1 and 2.

In its September 24, 2019, FOF/COL, the land court relied heavily on transcripts of witness testimony from the 1967 trial. The land court also concluded that the Kana'ina descendants who

had appeared and objected were precluded from defending the title of Kana'ina's defaulted heirs.

**E.    ICA proceedings**

A joint notice of appeal as well as cross-appeals were filed by various Kana'ina descendants, including the Schneider descendants and Kakalia.

Relevant here, the errors alleged by the Schneider descendants and Kakalia included the land court's (1) determination that Kahoma has a 78.04% interest in Lot 3A representing the percentages allocable to the defaulted Kana'ina descendants, and determining that cotenants do not have standing to defend commonly held property on behalf of all cotenants against an adverse possession claim; and (2) denial of their motions to dismiss based on the delays in prosecuting this case.

In response, Kahoma argued that (1) the appellants lacked standing to defend the interests of the defaulted heirs of Kana'ina and (2) the land court properly exercised its discretion in denying the motions to dismiss because the appellants failed to establish deliberate delay, contumacious conduct, or actual prejudice to the appellants.

The ICA agreed with Kahoma and ruled in a memorandum opinion that appellants lacked standing to challenge title to Lot 3A for the defaulted Kana'ina descendants.  In re Pioneer

Mill Co. & Kahoma Land LLC, No. CAAP-19-0000704, 2024 WL 3085307, at *7-9 (Haw. App. June 21, 2024) (mem. op.). Citing its opinion in Alexander & Baldwin, Inc. v. Silva, 124 Hawai'i 476, 482, 248 P.3d 1207, 1213 (App. 2011), the ICA ruled "it is well-established in Hawai'i that a respondent may not defeat a petitioner's [applicant's] claim to title by showing that even though they have no title, a third-party not in the action has superior title to the petitioner [applicant]." In re Pioneer Mill, 2024 WL 3085307, at *9. The ICA then determined it did not need to reach the merits of appellants' other allegations of error. Id.

The ICA filed its judgment on appeal on July 17, 2024.

F. Certiorari proceedings

Kakalia and the Schneider descendants filed timely certiorari applications.[12]

Kakalia raises various historical perspectives and issues, including the ICA's ruling that Kana'ina descendants lack standing to raise claims on behalf of other Kana'ina descendants as well as the fact that this case had been pending for 100 years. The Schneider descendants also raise various issues,

---

[12] Various other Kana'ina descendants appeared in the land court and ICA but did not file timely certiorari petitions. Our holdings in this opinion based on the Kakalia and the Schneider descendants' certiorari petitions will, however, also inure to their benefit.

including those two, which are dispositive as to Kahoma's remaining claim for adverse possession of Lot 3A.

Kakalia and the Schneider descendants are sometimes jointly referred to as "Petitioners."

### III. Standards of Review

#### A. Standing

The issue of standing is reviewed de novo on appeal. Tax Found. of Haw. v. State, 144 Hawai'i 175, 185, 439 P.3d 127, 137 (2019).

> Standing is that aspect of justiciability focusing on the party seeking a forum rather than on the issues he wants adjudicated. And the crucial inquiry in its determination is whether the plaintiff has alleged such personal stake in the outcome of the controversy as to warrant their invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on their behalf.

Tax Found. of Haw., 144 Hawai'i at 196, 439 P.3d at 148 (cleaned up).

#### B. Laches

A trial court's application of the equitable doctrine of laches is reviewed for abuse of discretion. An abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant. Chun v. Bd. of Trs. of Emps.' Ret. Sys. of State of Hawai'i, 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005).

### IV. Discussion

**A. Cotenants have standing to assert the interests of other cotenants against a party claiming adverse possession**

The ICA held that Petitioners lacked standing to challenge Decree 2017 because "it is well established in Hawaiʻi that a respondent may not defeat a petitioner's [applicant's] claim to title by showing <u>that even though they have no title</u>, a third-party not in the action has superior title to the petitioner [applicant]." In re Pioneer Mill, 2024 WL 3085307 at *9 (emphasis added). In so ruling, the ICA cited to its 2011 opinion in <u>Silva</u>, 124 Hawaiʻi at 482, 248 P.3d at 1213.

But <u>Silva</u> is clearly inapplicable based on its own language. It involved claims to title by defendants <u>having no title</u>. Unless adverse possession is established, actual Kanaʻina descendants are in the chain of title to Lot 3A. It is Kahoma that is without title to Lot 3A without establishing adverse possession. In any event, <u>Silva</u> did not involve plaintiffs seeking to quiet title based on adverse possession; rather, it involved competing claims to title based on paper title. <u>Silva</u>, 124 Hawaiʻi at 478, 248 P.3d at 1209.

This case, in contrast, involves a claim to quiet title based on adverse possession, which requires proof of actual, open, notorious, hostile, continuous, and exclusive possession

22

for the statutory period.  Wailuku Agribusiness Co. v. Ah Sam, 114 Hawaiʻi 24, 33, 155 P.3d 1125, 1134 (2007).

And in cases involving possessory interests to real estate, co-tenants have the right to defend not only their individual interests, but the interests of all their cotenants, with whom they are tenants in common.  Black's Law Dictionary defines tenancy in common as "[a] tenancy by two or more persons, in equal or unequal undivided shares, each person having an equal right to possess the whole property but no right of survivorship."  Black's Law Dictionary (12th ed. 2024).

Thus, as each cotenant has an equal right to possess the whole property, each cotenant is entitled to possession of the commonly held property against everyone but their cotenants, and one cotenant "may recover the entire property from a stranger." 86 C.J.S. Tenancy in Common § 162 (2024).

This concept of cotenants being able to assert the interests of other cotenants has historically been recognized in case law.  For example, in 1875, the Supreme Court of California stated in Chipman v. Hastings, 50 Cal. 310 (1875), as follows:

> The court below found that the plaintiff Caroline is the owner in fee of an undivided half of the premises as a tenant in common with persons other than the defendant, and held that, as such tenant in common, she was entitled to the possession of the whole of the premises as against all persons having no title, and that the defendant tortiously entered upon the premises and ousted her. Upon these facts the judgment was correctly entered below that she recover the whole of the premises.

23

<u>Chipman</u>, 50 Cal. at 314. Applying this passage from <u>Chipman</u> to our facts, Petitioners here are "owners in fee" as "tenant[s] in common with persons [other Kana'ina descendants] other than the defendant [here, Kahoma]," and are "entitled to the possession of the whole of the premises as against all persons having no title [Kahoma]."

Similarly, in 1891, the Supreme Court of Texas, in an action for trespass, ruled that "**one** tenant in common may recover the whole land as against a stranger, and that the recovery will inure to the benefit of his cotenants." <u>Boon v. Knox</u>, 80 Tex. 642, 644, 16 S.W. 448, 450 (1891) (emphasis added).[13]

Also, in 1941, the Supreme Court of Oregon, in an ejectment action, held that "a tenant in common may maintain an action of ejectment for recovery of possession of the property against the strangers to title." <u>Nat'l Surety Corp. v. Smith</u>, 168 Or. 265, 269-70, 114 P.2d 118, 119-120 (1941) (emphasis added).

---

[13] Also, the Court of Civil Appeals of Texas, addressing an action over mineral rights, stated that when "a cotenant seeking to recover the entire tract of land proves title in himself and his cotenants, the burden is not upon him to go further and make proof that his cotenants have not parted with their title." <u>Freeman v. Southland Paper Mills, Inc.</u>, 573 S.W.2d 822, 824 (1978). Correlatively, the Supreme Court of Colorado, in an action for conversion and trespass of property, stated "that in an action to recover real property one tenant in common may recover possession of the entire tract as against all persons except his cotenants." <u>Carlson v. McNeill</u>, 114 Colo. 78, 83, 162 P.2d 226, 229 (1945).

Thus, the common law has traditionally recognized that cotenants have standing to assert possessory interests of other cotenants against a stranger seeking possession.

And in Hawai'i, we have recognized that a tenant in common shares a general fiduciary relationship with their cotenants. City & Cnty. of Honolulu v. Bennett, 57 Haw. 195, 208, 552 P.2d 1380, 1390 (1976). Further, almost fifty years ago, we took judicial notice of the critical attitude towards previous over-generous rules of adverse possession. Bennett, 57 Haw. at 208, 552 P.2d at 1389. And although our holding today is not limited to our indigenous peoples, we note that Native Hawaiian descendants have a collective stake in the protection of their 'āina rights through being able to assert their non-appearing cotenants' interests against adverse possession claims.[14]

We therefore hold that cotenants have standing to assert the interests of other cotenants against a party claiming adverse possession.

**B.  The land court abused its discretion by denying the motions to dismiss based on laches**

The second issue we address on certiorari resolves the adverse possession claim as to Lot 3A.

---

[14]   There are various reasons parties might not respond to a quiet title action.  In this case, it does not appear personal service on Kana'ina descendants was ever even attempted.  Also, most people do not read notices in newspapers.  And here, the 2010 notice did not even say the notice was directed to heirs of Charles Kana'ina.

After erroneously determining that Petitioners lacked standing to assert their cotenants' interests, the ICA did not address Petitioners' assertions of error based on the land court's denial of their motions to dismiss.  As noted, in 2015 and 2016, Kakalia and the Schneider descendants filed motions to dismiss based on the lengthy delay, which were expressly or implicitly denied by the land court.  The Schneider desendants' motion explicity asserted both laches and HRCP Rule 41(b).  Although Kakalia did not specifically use the word "laches," he repeatedly objected to the lengthy delay, and submissions of self-represented litigants are to be interpreted liberally.  Waltrip v. TS Enters., Inc., 140 Hawai'i 226, 239, 398 P.3d 815, 828 (2016).

We hold that the land court abused its discretion by refusing to dismiss the Lot 3A adverse possession claim based on laches.

The doctrine of laches reflects the equitable maxim that equity aids the vigilant, not those who slumber on their rights and is a defense to cases brought in law and in equity.  Ass'n of Apartment Owners of Royal Aloha v. Certified Mgmt., Inc., 139 Hawai'i 229, 231, 234, 386 P.3d 866, 868, 871 (2016).  Laches requires two essential elements: (1) an unreasonable delay by the plaintiff in bringing or advancing the claim, and

(2) resulting prejudice due to the delay.  Herrmann v. Herrmann, 138 Hawai'i 144, 153, 378 P.3d 860, 869 (2016).

As stated by the United States Supreme Court in Johnston v. Standard Mining Co., 148 U.S. 360, 370 (1893), "It has been frequently held that the mere institution of a suit does not, of itself, relieve a person from the charge of laches, and that if [they] fail[] in the diligent prosecution of the action the consequences are the same as though no action had been begun." Our court also recognizes that laches can be raised in response to undue delays occurring during litigation, not just at the commencement of an action.  See Herrmann, 138 Hawai'i at 155, 378 P.3d at 871; HawaiiUSA Fed. Credit Union v. Monalim, 147 Hawai'i 33, 37-38, 464 P.3d 821, 825-26 (2020).[15]

---

[15]    In Monalim, this court considered a laches defense raised based on a four-year delay in filing a motion for deficiency judgment after a foreclosure judgment.  147 Hawai'i at 36, 464 P.3d at 824.  The mortgagor argued that this delay was both unreasonable and prejudicial, as they had made financial adjustments based on the assumption that no further claims would be pursued.  See id.  This court vacated the deficiency judgment and remanded for consideration of laches, affirming that laches can apply to delays occurring within litigation itself when those delays result in undue prejudice to the opposing party.  Monalim, 147 Hawai'i at 44, 464 P.3d at 832.

In Herrmann, this court addressed a laches defense raised in a post-decree motion for reimbursement of child support overpayments.  138 Hawai'i at 153, 378 P.3d at 869.  The father waited seven years before seeking reimbursement for overpayment, and the mother argued that the delay was unreasonable and had prejudiced her, as her financial situation had changed during that time.  Herrmann, 138 Hawai'i at 153-55, 378 P.3d at 869-71.  We remanded for the family court to assess whether the delay was unreasonable and whether it caused prejudice to the mother.  Herrmann, 138 Hawai'i at 157, 378 P.3d at 873.

Here, the 100-year delay in prosecuting this case to conclusion is unprecedented and is obviously unreasonable. Kahoma stands in the shoes of Pioneer Mill, which did not pursue the case for many decades at a time, as outlined above.  Kahoma itself waited another nine years after receiving its deeds from Pioneer Mill before prosecuting the case.  The delays in this case were blatantly unreasonable, satisfying the first element.

With respect to the second element, prejudice, the adverse possession claim as to Lot 3A was based on possession that allegedly occurred before the 1919 filing of the land court application.  The Examiner was not able to make a determination regarding adverse possession, indicating there were factual issues.  By the time Petitioners filed their motions to dismiss in 2015 and 2016, witnesses, Kanaʻina descendants, oral histories, and memories, were simply gone.  Petitioners were also unable to cross-examine the 1967 trial witnesses, upon which the land court relied in its adverse possession ruling. The prejudice is obvious.

Therefore, the land court abused its discretion by denying Petitioners' motions to dismiss based on laches.[16]

---

[16]    We therefore need not address HRCP Rule 41(b).

## V.    Conclusion

For these reasons, we vacate the ICA's July 17, 2024, judgment on appeal to the extent it affirmed the land court's September 24, 2019, FOF/COL as well as the land court's Decree 2017.  We vacate the land court's September 24, 2019, FOF/COL as well as its Decree 2017 awarding 78.704% of Lot 3A to Kahoma. We affirm the ICA's judgment on appeal to the extent it affirmed the land court's Decree 2016 regarding title to Lots 1 and 2.

We remand to the land court for further proceedings consistent with this opinion, which is to include dismissal of the land court application as to Lot 3A.  Although this dismissal is without prejudice, if a new application to quiet title as to Lot 3A is filed, current Hawai'i law will govern.

Michael J. Matsukawa
for petitioners Gladiola
Aloha Schneider, et al.

Edward P. Kakalia
pro se petitioner

W. Keoni Shultz and
Calvert G. Chipchase
for respondent Kahoma
Land LLC

David B. Kaapu
for respondents Arlene
K. Kakalia, et al.

Lance D. Collins,
Bianca Isaki, Ryan D.
Hurley, and Diego A.
Rivera

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Lisa M. Ginoza

/s/ James S. Kawashima



for amici curiae Kuleana
Kuʻikahi, Aha Moku O Maui,
Nā ʻAikāne O Maui, Kiaʻi
Kauaula, Ka Malu O
Kahālāwai, Nā Mamo Aloha
ʻAina O Honokōhau, and
West Maui Preservation
Association